**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Mary Ann HIMMELWRIGHT,
Defendant-Appellant.**

No. 76–1295.

United States Court of Appeals,
Fifth Circuit.

May 9, 1977.

Theodore J. Sakowitz, Federal Public Defender (Court-appointed), Michael J. Rosen, Asst. Federal Public Defender, Miami, Fla., for defendant-appellant.

Robert W. Rust, U. S. Atty., Charles A. Intriago, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, and TUTTLE and TJOFLAT, Circuit Judges.

TJOFLAT, Circuit Judge:

The sole issue in this case is whether the appellant, Mary Ann Himmelwright, was subjected to an illegal search at the hands of customs officials at the Miami International Airport. This issue was resolved against the appellant in the proceedings below. *United States v. Himmelwright*, 406 F.Supp. 889 (S.D.Fla.1975). The search in question revealed that Ms. Himmelwright was attempting to smuggle some 105 grams of cocaine into this country by hiding the contraband in her vagina. Thus, this case draws our attention to a genre of border search considerably more sensitive, and admittedly more intrusive, than the garden variety customs inspection.

## I

The material facts of this case are not in dispute. On June 7, 1975, Mary Ann Himmelwright arrived at Miami International Airport aboard a flight from Colombia. She was wearing platform shoes and her clothing was not bulky or loose-fitting. She went through customs, where the matter-of-course search of her baggage produced no evidence of any crime. Himmelwright declared a few items and appeared calm throughout this routine phase of the customs investigation.

After Himmelwright's baggage had been searched, two customs patrol officers approached her. In the experience of these customs officials, a young woman traveling alone, especially on a short excursion to Colombia, was a somewhat suspicious circumstance. Additionally, the officers knew from their experience that platform shoes were often used as a cache for smuggled contraband. Because of these facts, and because Himmelwright appeared unusually calm,[1] the officials asked to see her passport. The passport revealed that Himmelwright had been out of this country for seven days. The customs patrol officers asked what Himmelwright's occupation was and she told them that she was a secretary to an insurance company. As the discussion progressed, however, Himmelwright's story changed. She first altered her response by saying that she was an agent for an insurance company, and later told the officers that she was an insurance broker. Throughout this colloquy, Himmelwright continued to appear excessively calm to the customs officers.

---

1. At the suppression hearing, one of the customs officers testified that Himmelwright's calm demeanor was a suspicion-arousing factor:

    Usually when people come in here they are a little apprehensive when they come into the Customs enclosure, a little nervous, such as I am now. And she had none of these characteristics about her. She was extremely calm and this brought my attention to her.

    Transcript of suppression hearing at 16.

Because of Himmelwright's excessive calmness and evasive answers to the queries about her occupation, the officers determined that a further investigation was warranted and decided to summon two female customs inspectors who were on duty at the time. After one officer had left to find the female officers, the remaining officer commented on certain matchbooks in Himmelwright's purse. Himmelwright then explained that she worked as a cocktail waitress in a bar. This last change in Himmelwright's description of her occupation led the officer in charge to the conclusion that a "100% search"[2] was in order.

When the two female customs inspectors arrived, they took Himmelwright to a "secondary search" room. This room was completely enclosed and removed from the view of those outside. The inspectresses asked Himmelwright to remove her platform shoes, and these were handed to an officer outside the room for X-ray examination. Himmelwright was next requested to remove her blouse. A thorough search of the blouse revealed no contraband. Himmelwright replaced her blouse and was then asked to remove her slacks and stand with her legs spread apart. She wore no undergarments. An inspectress crouched in front of Himmelwright and noticed a one-quarter inch tab protruding from Himmelwright's vagina. In response to the inspectress's inquiry, Himmelwright stated that the object was a tampon. She soon changed her mind, however, and told the inspectress that the protruding object was a tissue. The inspectress did not believe that the protruding object resembled either a tampon or a tissue, and requested that Himmelwright remove the object. Himmelwright did so, and the object in question turned out to be one of six rubber condoms secreted in Himmelwright's vagina. Altogether, the six condoms contained a total of 105 grams of cocaine. At this point, Himmelwright was placed under arrest.

At no point during their examination of Himmelwright did the female customs inspectors touch her body. Of course, neither was Himmelwright ever subjected to a probing search of her orifices.

When Himmelwright's case came to trial, she moved to suppress the fruits of the search on fourth amendment grounds. The trial court conducted an evidentiary hearing and then denied the motion. A bench trial ensued, and Himmelwright was convicted of importing cocaine[3] and of possessing cocaine with intent to distribute.[4] The district court sentenced her to serve concurrent three-year prison terms for these violations.

The only issue which Himmelwright asserts before us is whether the search which led to the discovery of the contraband violated the fourth amendment. For the reasons set forth below, we conclude that it did not, and accordingly affirm Himmelwright's conviction.

II

■ To begin, we note that there is no dispute in this case over whether Himmelwright was searched under circumstances constituting the "functional equivalent of the border." See *Almeida-Sanchez v. United States*, 413 U.S. 266, 272–73, 93 S.Ct. 2335, 37 L.Ed.2d 596 (1973). The search was conducted at Miami International Airport, and Himmelwright had just disembarked from a flight originating in Colombia. Thus, it was constitutionally permissible for the customs officials initially to stop Himmelwright, to examine her visa, and to search her luggage and personal effects for contraband regardless of whether the officials had any articulable suspicion that ac-

---

**2.** At the suppression hearing, the officers testified to the effect that a "100% search" entails a thorough examination of a suspect's outer clothing and underclothing, as well as a "visual search" of the body. Such a search does not involve a search of body cavities, since the customs agents testified that they are not authorized to go that far. As one officer explained, "[o]nly a qualified physician is authorized to do that." *Id.* at 37.

**3.** In violation of 21 U.S.C. §§ 952(a) & 960(a)(1) (1970).

**4.** In violation of *id.* § 841(a)(1).

tual criminal activity was afoot.[5] The proposition that such stops and searches need not be grounded in any particularized and articulable suspicion ultimately stems from policy considerations. As this court stated in *Brennan*, "[t]he national interests in self-protection and protection of tariff revenue authorize a requirement that persons crossing the border identify themselves and their belongings as entitled to enter and be subject to search." *United States v. Brennan*, 538 F.2d 711, 715 (5th Cir. 1976).

All that this means is that "reasonableness" in the fourth amendment sense always depends upon a balance which must be struck between, on the one hand, the level of official intrusion into individual privacy and, on the other hand, the public interest to be served by such an intrusion.[6] Our constitution of course demands that most "searches" or "seizures" be predicated upon probable cause. However, it is equally clear that certain genres of search or seizure based upon less than probable cause are constitutionally legitimate. The matter-of-course search of luggage at the border typifies one such genre; other examples are the "stop-and-frisk" situation involved in *Terry* and at least the early phases of automobile stops accomplished at permanent checkpoints which operate some distance from our national border or the "functional equivalent" thereof.[7] In each of these instances, it is the weighing of the public interest against the level of personal intrusion which leads to the conclusion that fourth amendment reasonableness allows such searches or seizures to be based upon less than probable cause.

This same weighing process convinces us that not all searches at the border can be constitutionally justified regardless of whether the government officials had any reason to suspect that criminal activity might be afoot. The level of intrusion occasioned by a strip search is significantly greater than the intrusion involved when customs officials search a person's luggage or stop a person to examine a visa. For this reason, several courts have adopted a "real" or "reasonable" suspicion standard to govern strip searches at the border. The most recent example in this circuit is *Perel v. Vanderford*, 547 F.2d 278 (5th Cir. 1977), a *Bivens*-type civil action alleging an unconstitutional strip search at the El Paso, Texas, border station. In that case, we upheld a district court's refusal to charge a jury that the lawfulness of a strip search at the border depended upon the existence of probable cause. Instead, the panel stated, a "real or reasonable suspicion" is all that the fourth amendment requires.[8]

The *Perel* panel also pointed out in a footnote that "there may be substantive differences between the 'real suspicion' standard and the 'reasonable suspicion' standard." *Id.* at 280, n.1. This observation stems from an examination of the Ninth Circuit's experience with border search cases involving greater than average degrees of intrusion. That court has attempted, it seems, to establish standards of fourth amendment reasonableness which demand some degree of articulable suspicion without requiring full-blown probable cause. In a strip search case, the court requires a "real suspicion" of criminal activ-

---

5. *See United States v. Brignoni-Ponce*, 422 U.S. 873, 887, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975) (Rehnquist, J., concurring); *Carroll v. United States*, 267 U.S. 132, 154, 45 S.Ct. 280, 69 L.Ed. 543 (1925); *cf. United States v. Brennan*, 538 F.2d 711, 715 (5th Cir. 1976).

6. As Mr. Justice Powell stated in *United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 3081, 49 L.Ed.2d 1116 (1976), "In delineating the constitutional safeguards applicable in particular contexts, the Court has weighed the public interest against the Fourth Amendment interest of the individual . . . ." *Id.* at 3081, *citing United States v. Brignoni-Ponce*,

422 U.S. 873, 878, 95 S.Ct. 2574, 45 L.Ed.2d 607 (1975), and *Terry v. Ohio*, 392 U.S. I, 20–21, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

7. *See United States v. Martinez-Fuerte*, 428 U.S. 543, 96 S.Ct. 3074, 49 L.Ed.2d 1116 (1976).

8. *See also United States v. Forbicetta*, 484 F.2d 645 (5th Cir. 1973), *cert. denied*, 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772 (1974); *United States v. Diaz*, 503 F.2d 1025 (3d Cir. 1974); *United States v. Guadalupe-Garza*, 421 F.2d 876 (9th Cir. 1970).

ity as a condition precedent to a valid strip search.[9] In cases involving "body cavity" searches, the court looks to whether there was a "clear indication" of criminal conduct justifying the search.[10]

As the Ninth Circuit's experience demonstrates, however, the application of these variegated tests is not without its problems as a matter of case-by-case analysis. Aside from the inherent indefiniteness of the terms "real suspicion" and "clear indication," it is not always apparent where one should draw the line between strip searches and body cavity searches in order to determine which test should be applied.[11] For these reasons, we are unwilling to adopt the specific approach utilized by the courts of the Ninth Circuit. Instead, we feel that the "reasonable suspicion" standard is flexible enough to afford the full measure of protection which the fourth amendment commands.

We would hasten to add that "reasonable suspicion" in this context includes a requirement that customs officials have cause to suspect that contraband exists in the *particular place* which the officials decide to search.[12] In border search cases, it is true that reason to suspect someone of criminal activity may often give reason to search that person, for the very nature of the suspected crime is that contraband is secreted somewhere in the person's belongings or on the person. But a generalized suspicion of criminal activity such as that which is fostered, for example, when one

closely resembles a "smuggling profile" will not normally in itself permit a reasonable conclusion that a strip search should occur. A fruitless search of the person's luggage may well dispel the reasonableness of any previously held suspicions. In another case, however, the circumstances notwithstanding the fruitless search of the luggage may well render a physical search reasonable under the fourth amendment. As the courts have universally recognized in these fourth amendment cases, each case must finally turn on its own facts.

### III

Examining the particular facts of this case, then, we observe that the search of Himmelwright progressed through several stages. First, her luggage was routinely searched. Next, she was orally questioned about her background and the nature of her trip to Colombia. Third, her outer garments were searched, which search included an X-ray examination of her platform shoes. Fourth, her exterior body surface was examined. It was this last stage of the overall search which led to the discovery of the contraband.

In considering the objective facts which were known to the customs officials in Himmelwright's case, we conclude that those facts justified the decision to search her exterior body surface. Himmelwright fit a known pattern of characteristics which

9. *See United States v. Guadalupe-Garza*, 421 F.2d 876 (9th Cir. 1970).

10. *See Rivas v. United States*, 368 F.2d 703 (9th Cir. 1966), *cert. denied*, 386 U.S. 945, 87 S.Ct. 980, 17 L.Ed.2d 875 (1967). *See also United States v. Sosa*, 469 F.2d 271 (9th Cir. 1972), *cert. denied*, 410 U.S. 945, 93 S.Ct. 1399, 35 L.Ed.2d 612 (1973) (rectal search); *United States v. Shields*, 453 F.2d 1235 (9th Cir.), *cert. denied*, 406 U.S. 910, 92 S.Ct. 1615, 31 L.Ed.2d 821 (1972) (vaginal search); *United States v. Castle*, 409 F.2d 1347 (9th Cir.), *cert. denied*, 396 U.S. 975, 90 S.Ct. 443, 24 L.Ed.2d 443 (1969) (rectal search); *Morales v. United States*, 406 F.2d 1298 (9th Cir. 1969) (vaginal search); *Henderson v. United States*, 390 F.2d 805 (9th Cir. 1967) (vaginal search).

11. *Compare United States v. Mastberg*, 503 F.2d 465 (9th Cir. 1974) (search analyzed as "body cavity" search) *with United States v. Holtz*, 479 F.2d 89 (9th Cir. 1973) (substantially similar search analyzed as "strip" search).

Nor is it clear to us that all body cavity searches involve the same level of intrusion upon individual privacy. One could certainly argue the validity of a distinction between, say, the cursory inspection of a suspect's oral cavity and a probing search of the same suspect's vaginal cavity.

12. *See, e. g., United States v. Bailey*, 458 F.2d 408 (9th Cir. 1972); *United States v. Flanagan*, 423 F.2d 745 (5th Cir. 1970). *See also Chimel v. California*, 395 U.S. 752, 89 S.Ct. 2034, 23 L.Ed.2d 685 (1969).

experience had associated with smuggling activity: she was a woman, traveling alone, wearing platform shoes, and recently returning from a short stay in Colombia.[13] More significantly, she gave evasive and contradictory answers when questioned about her employment. Under those circumstances, the decision to search her exterior body surface was a reasonable one within the meaning of the fourth amendment.

We should point out what this case does *not* involve. The most suspicious fact here—that is, the tab protruding from Himmelwright's vagina—was discovered in the course of an *exterior* search of the suspect's body. There was no probing search of Himmelwright's orifices.[14] Had the customs inspectress not seen a protruding object, any further search may well have been constitutionally impermissible. On the facts before us, however, it was reasonable for the customs officers to request that Himmelwright remove the suspicious object from her body.

## IV

For these reasons we conclude that the district court properly denied Himmelwright's motion to suppress. Accordingly, the judgment below is AFFIRMED.

---

**13.** We should add parenthetically that it is doubtful that in this day these characteristics standing alone would justify a body search. It is in conjunction with the other facts known to the customs officials that we accord significance to Himmelwright's possession of these characteristics.

**14.** As we pointed out in note 2 *supra*, these customs officials did not consider themselves authorized to conduct such a search.