UNITED STATES of America, Plaintiff-Appellee,

v.

Gary Thomas RIEVES and Virginia Gayle Berry, Defendants-Appellants.

No. 78–5028.

United States Court of Appeals, Fifth Circuit.

Nov. 22, 1978.

Charles I. Poole, Miami, Fla. (Court-appointed), for Rieves.

Theodore J. Sakowitz, Federal Public Defender, Joel Kaplan, Asst. Federal Public Defender, Miami, Fla., for Berry.

Jack V. Eskenazi, U. S. Atty., Hugh F. Culverhouse, Jr., Linda Collins Hertz, Asst. U. S. Attys., Miami, Fla., for plaintiff-appellee.

Before BROWN, Chief Judge, GODBOLD and FAY, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Gary Thomas Rieves and Virginia Gayle Berry were arrested and indicted on charges of importing cocaine into the United States [1] and of possession with intent to

1. 21 U.S.C.A. §§ 952(a) and 960(a)(1) prohibit importation of controlled substances:

**§ 952. Importation of controlled substances—Controlled substances in schedules I or II and narcotic drugs in schedules III, IV, or V; exceptions**

(a) It shall be unlawful to import into the customs territory of the United States from any place outside thereof (but within the United States), or to import into the United States from any place outside thereof, any controlled substance in schedule I or II of subchapter I of this chapter, or any narcotic drug in schedule III, IV, or V of subchapter I of this chapter, except that—

(1) such amounts of crude opium and coca leaves as the Attorney General finds to be necessary to provide for medical, scientific, or other legitimate purposes, and

(2) such amounts of any controlled substance in schedule I or II or any narcotic drug in schedule III, IV, or V that the Attorney General finds to be necessary to provide for the medical, scientific, or other legitimate needs of the United States—

(A) during an emergency in which domestic supplies of such substance or drug are found by the Attorney General to be inadequate, or

(B) in any case in which the Attorney General finds that competition among domestic manufacturers of the controlled substance is inadequate and will not be rendered adequate by the registration of additional manufacturers under section 823 of this title,

may be so imported under such regulations as the Attorney General shall prescribe. No crude opium may be so imported for the purpose of manufacturing heroin or smoking opium.

distribute cocaine.[2] The Court without a jury convicted them as charged,[3] and this appeal followed. We affirm.

On June 11, 1977, at approximately 4:20 p. m., appellant Berry arrived at the Miami International Airport on a flight from Bogota, Colombia.[4] She claimed her baggage and awaited routine custom inspection [5] in Inspector Christine Hinton's line. Although Hinton found no contraband in Berry's luggage, she noticed that Berry was wearing a very large, loose-fitting pantsuit. She questioned appellant generally about her trip and was told that Berry was a housewife from Hawaii, traveling alone on vacation to Mexico and Colombia.

Believing that she should investigate Mrs. Berry further, Inspector Hinton called for her supervisor, Sigmund Korzeniowski, and requested that he approve a secondary search. Korzeniowski then questioned Berry, who told him that her daughter's husband or boyfriend had paid for her trip. As they were talking, Korzeniowski noticed that Berry's clothing appeared to be several sizes too large for her and that there were "unnatural contours" in the leg, crotch, and bosom areas of her body.[6]

During this conversation, another customs inspector, Edward Archer, requested Korzeniowski's attention. He had examined the luggage of appellant Rieves, who had just arrived from Bogota, Colombia.[7] Although he had found no contraband, he had received a "positive" TECS read-out,[8] indicating that Rieves was suspected of smuggling cocaine. Korzeniowski noticed that Rieves was wearing a shirt with a Hawaiian insignia and, upon examining his passport, discovered that Rieves and Berry

**§ 960. Prohibited acts A—Unlawful acts**

(a) Any person who—

(1) contrary to section 952, 953, or 957 of this title, knowingly or intentionally imports or exports a controlled substance, * * * shall be punished as provided in subsection (b) of this section.

2. 21 U.S.C.A. § 841(a)(1) prohibits possession with intent to distribute cocaine:

**§ 841. Prohibited acts A—Unlawful acts**

(a) Except as authorized by this subchapter, it shall be unlawful for any person knowingly or intentionally—

(1) to manufacture, distribute, or dispense, or possess with intent to manufacture, distribute, or dispense, a controlled substance;

3. Both appellants had filed motions to suppress, Berry contesting the constitutionality of her search, Rieves claiming that his confession was involuntary. A magistrate held an evidentiary hearing and entered findings of fact and a recommendation that the trial judge deny the motions. When the matter came before the Court for trial and reconsideration of the suppression motions, Berry and Rieves both waived jury trial and stipulated that since the testimony at trial would track that at the suppression hearing, the Court should proceed on the basis of the transcript of that hearing.

4. We present the facts as the magistrate found them and as the District Judge adopted them. Both appellants contest particular findings and point to conflicts in the testimony to support their version of the facts. According to well established precedent in this Circuit, however, we must, in the face of conflicting testimony, accept the magistrate's findings, which by adoption the trial judge made his own in determining guilt or innocence. She made her recommendation after "[h]aving carefully listened to the testimony and observed the demeanor of the witnesses and defendants in this case . . . ." Magistrate's Report at 11.

After a careful and independent review of the entire suppression hearing transcript, we conclude that the magistrate's findings were not clearly erroneous. *See, e. g., Dickens v. United States,* 5 Cir., 1977, 545 F.2d 886.

5. As this Court observed in *United States v. Himmelwright,* 5 Cir., 1977, 551 F.2d 991, 993, *cert. denied,* 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189, a customs official at the Miami International Airport may stop a person who has just arrived from Colombia to examine his or her visa and search luggage, even without "any articulable suspicion that actual criminal activity [is] afoot." Such searches occur "under circumstances constituting the 'functional equivalent of the border.' "

6. Korzeniowski also testified that Mrs. Berry wore her jacket open, with a blouse underneath it.

7. Appellants arrived on different flights, Berry on Braniff Airlines, Rieves on Avianca.

8. Customs inspectors in many major cities routinely feed the names and birth dates of persons entering the country into a computer system known as Treasury Enforcement Capability (TECS). The computer stores notice of outstanding arrest warrants, names of persons suspected of smuggling, and other related information.

had gone through the same Colombian customs examiner on the same day. This additional information, along with his observation that Rieves was nervously watching the "exceptionally calm" Mrs. Berry, led Korzeniowski to order a personal search of Berry.

Inspector Hinton and another female customs official escorted Mrs. Berry to a closed room. There the conducted a secondary search, which produced ten condoms and two plastic bags of cocaine that appellant had secreted in her bra and between her girdle and panty hose.[9] Hinton officially arrested Mrs. Berry at approximately 4:30 p. m. and immediately read the *Miranda* rights to her from an official customs form. After Mrs. Berry read the form herself and stated that she understood her rights, Inspector Hinton notified the Drug Enforcement Administration of the arrest.[10]

While Hinton was searching Berry, or shortly thereafter, a further search of Rieves' luggage produced condoms of the same type that Berry had used to carry cocaine. It also revealed the same type of tape that she had used to attach the cocaine to her body. A subsequent secondary search of Rieves failed to produce any contraband.

At approximately 4:50 p. m. DEA agent Charles Martinez arrived at the Miami airport. After identifying himself to Mrs. Berry, advising her of her rights, and obtaining her assurance that she understood those rights, he spoke briefly with Rieves and read him the *Miranda* warnings.[11] Martinez and another DEA agent, Kenneth Goodman, began questioning Berry at approximately 5:00 p. m. During the subsequent interrogation, which lasted until 5:45 p. m., Berry admitted that a man known to her as G.T. had solicited her aid in importing cocaine. She gave a physical description that fit Rieves and then identified his passport photograph as "G.T."[12]

Agent Martinez looked through Mrs. Berry's purse as he and Agent Goodman were questioning her and found hotel receipts from the Hotel Tequendama in Bogota, Colombia. He also seized a note pad, on which Mrs. Berry had written the number "1602." She told the agents that this was Rieves' room number. Customs also found Rieves' receipt for room 1602 at the Hotel Tequendama among his personal effects.

Rieves was arrested at approximately 5:45 p. m.[13] in Korzeniowski's office. After Agent Martinez again advised him of his *Miranda* rights, Rieves denied knowing Berry and stated that he thought he should speak to an attorney. Martinez asked no further questions. Although he walked in and out of the customs inspector's office several times during the next few hours, and told Rieves that any cooperation would be made known to the Court at the time of sentencing, he elicited no statements from Rieves. At 8:30 p. m., despite his earlier expression of desire to remain silent, Rieves asked to speak with Agent Martinez. He then said that Berry was not "involved," but was merely "bringing it in."[14] After

9. According to Inspector Hinton's testimony, she asked appellant to lift her blouse. When Mrs. Berry lifted it in front, Hinton could see "something inside her bra." She instructed appellant to "pull it up or open it up," and Berry admitted having contraband. Hinton then instructed her to undress completely. She at no time touched Mrs. Berry.

10. Inspector Hinton also testified that she did not question Berry after reading the *Miranda* rights.

11. Although Rieves had not been formally arrested, Customs officials were detaining him in another room.

12. She later identified him in person.

13. He was arrested on the basis of Mrs. Berry's statements identifying him and describing the smuggling plan.

14. Contrary to the Magistrate's finding that no one questioned him after he invoked his right to remain silent, Rieves insists that he was repeatedly interrogated and that he did not begin talking until 9:30 p. m. Moreover, although Agent Martinez testified that appellant appeared calm, confident, and composed, Rieves stated that he had not slept for over 24 hours and had had two Valium tablets and several drinks. (He does acknowledge, however, that when Agent Martinez asked him if he

having given their oral statements, both appellants gave extensive written statements detailing their activities.

Appellant Berry now claims that reasonable suspicion [15] did not support the strip search of her person. Since, she argues, the resulting seizure of cocaine was therefore illegal, the Court should have granted her motion to suppress. We, however, do not agree that Mrs. Berry's appearance and demeanor did not raise suspicions reasonably sufficient to warrant the search. First, she fit several of the characteristics of the "smuggling profile" [16]—a woman, traveling alone, returning from a short stay in Colombia where she had no relatives, and wearing overly large clothing. Although she presented more than one bag for customs inspection and calmly declared over $100 worth of merchandise,[17] these factors were outweighed by Customs Supervisor Korzeniowski's observation of unnatural contours in the bust, leg and crotch areas.[18] He had constitutionally sufficient reason to believe that a search of Mrs. Berry's body would produce contraband.

Our prior decisions support the result we reach in this case. In *Forbicetta, supra,* a young, unemployed woman returned from vacation in Colombia wearing a loose-fitting dress. She carried only one bag and declared no purchases. Based upon this evidence, we upheld a strip search, which revealed two and one-half pounds of cocaine attached to her body. Similarly, in *United States v. Smith, supra,* we upheld a strip search conducted on a "very, very nervous," "very pale," unemployed man who was returning from Colombia after "vacationing" alone there. Finally, in *United States v. Himmelwright, supra,* we considered the search of a young woman who was traveling alone after a short stay in Colombia. She wore platform shoes [19] and, more significantly, gave evasive answers when questioned about her employment. We affirmed her resulting conviction, finding that the decision to search her was reasonable. Applying the results of those cases to the present facts, we find that Berry's unnatural contours, like Smith's nervousness

felt "okay," he replied that he did.) Again, the magistrate—and the trial judge—resolved these conflicts in favor of the Government. *See* note 4, *supra.*

**15.** We have often approved the "reasonable suspicion" standard for secondary customs searches. *See, e. g., United States v. Smith,* 5 Cir., 1977, 557 F.2d 1206, 1208, *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777. In *Smith,* this Court emphasized that "[t]his Circuit expressly rejects the Ninth Circuit rule" that "real suspicion" is required for strip searches. We again find that "a 'reasonable suspicion' standard affords sufficient fourth amendment protection." *Id.*

**16.** The "smuggling profile" has been compiled by customs agents based on characteristics found in a high percentage of individuals who attempt to smuggle drugs. This Court has considered "pattern[s] of characteristics" associated with smuggling activity in other drug cases. *United States v. Forbicetta,* 5 Cir., 1973, 484 F.2d 645, 646, *cert. denied,* 1974, 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772; *United States v. Himmelwright, supra* at 995–96.

**17.** According to the smuggling profile, persons attempting to smuggle cocaine will usually carry only one suitcase and will declare nothing in order to clear customs quickly. *United States v. Smith, supra* at 1208 n.1. Appellant claims that this is the most significant indicator.

**18.** Thus, while we recognize, as we have before, that mere resemblance to a smuggling profile will not "permit a reasonable conclusion that a strip search should occur," we again hold that certain circumstances "notwithstanding the fruitless search of luggage may well render a physical search reasonable." *United States v. Himmelwright, supra* at 995.

Korzeniowski's statement—that he had not decided to authorize the search until he received additional information from Inspector Archer—does not affect our determination. While the Supervisor's hesitancy in ordering secondary searches is admirable, he nevertheless could have ordered the search based on his own observations.

In reaching this decision, we find it unnecessary to address Mrs. Berry's contention, based on *United States v. Afanador,* 5 Cir., 1978, 567 F.2d 1325, that information relating to Rieves could not bolster the reasonable suspicion necessary to justify her strip search.

**19.** The Court observed that "the officers knew from their experience that platform shoes were often used as a cache for smuggled contraband." 551 F.2d at 992. An x-ray of the shoes, however, revealed that Ms. Himmelwright had hidden nothing in them.

and Himmelwright's evasiveness, supported Korzeniowski's decision to authorize the secondary search.

We now turn to appellant Rieves' claim that his oral and written statements were coerced. To support his position, he maintains first that custom officials should have released him after thorough searches of his body and luggage produced no contraband. His continued detention, he argues, was not based upon probable cause. He further contends that during this detention, customs officials continually interrogated him despite his consistent invocation of his right to remain silent and his request for an attorney.

A re-examination of the magistrate's report reveals that the facts as she found them do not support Rieves' contentions. In claiming that customs officials detained him merely on the basis of (1) the TECS "hit" and (2) the fact that he and Mrs. Berry had gone through the same Colombian customs inspector, he ignores the discovery of the tape and condoms in his luggage. He disregards Supervisor Korzeniowski's observations—that Rieves nervously watched Mrs. Berry and that the inscription on his shirt indicated that, even though he claimed to reside in Michigan, he had been in Hawaii.[20] Finally, he does not even mention that customs officials, while searching Rieves' personal effects, found a receipt from the same hotel Mrs. Berry had stayed in in Colombia.[21] In light of all of these factors, we cannot say that the customs and DEA officials acted without probable cause in holding Rieves.[22] We acknowledge that the Government's case against Rieves grew stronger as he was detained. We point out, however, that although arrest (and detention) must stand upon more than reasonable suspicion, the arresting officer need not have in hand evidence sufficient to convict. *See Wong Sun v. United States,* 371 U.S. 471, 83 S.Ct. 407, 9 L.Ed.2d 441.

The magistrate's findings similarly do not support Rieves' claim that customs and DEA officials continued to interrogate him after he invoked his right to remain silent and asked to see an attorney. According to the magistrate, Agent Martinez did go in and out of the room in which Rieves was sitting and did mention that he would make known to the Court any cooperation on Rieves' part. These comments, however, constituted neither interrogation nor coercion. Rieves admitted that his rights had been read to him and that he understood them. When he reinitiated—unprompted by further interrogation—the dialogue with Agent Martinez, he affirmatively demonstrated that he wished to waive his right to remain silent.[23]

20. As we pointed out earlier, Mrs. Berry was a resident of Hawaii and admitted beginning her trip there. Both appellants eventually admitted that they had planned the smuggling venture in Hawaii.

21. Although it is unclear (from the magistrate's findings) just when customs officials found Rieves' receipt, they definitely realized its significance during Rieves' detention.

22. Appellant cites *United States v. Afanador,* 5 Cir., 1978, 567 F.2d 1325, presumably attempting to argue that customs officials could not justify their detention of Mr. Rieves by transferring to him their reasonable suspicion that Mrs. Berry was smuggling contraband. While *Afanador* does hold that "the fourth amendment does not permit any automatic or casual transference of 'suspicion,'" *id.* at 1331, the opinion acknowledges that in certain circumstances "the degree of suspicion as to an already suspicious individual may be somewhat enhanced by virtue of suspicious activity by a closely linked traveling companion." *Id.*

Rieves cannot find support in the Court's having reversed Ms. Afanador's conviction. The only basis the Government had for searching her was that a DEA agent had received information that a fellow stewardess was carrying cocaine. The Court explained that:

> [t]hough a Siamese symbiosis need not be demonstrated, more than physical companionship and/or a working relationship is required.

A much more suspicious connection existed between Rieves and Berry.

23. We must point out that although *Miranda* requires Government agents to cease all interrogation when a suspect expresses a desire to consult with an attorney, it does not mandate immediate access to an attorney. We find that the agents' statement that Mr. Rieves could consult an attorney when he arrived at jail satisfies *Miranda.* See *Atwell v. United States,* 5 Cir., 1968, 398 F.2d 507.

A long line of decisions of this Circuit supports this result. *See, e. g., United States v. Hopkins*, 5 Cir., 1970, 433 F.2d 1041, *cert. denied*, 1971, 401 U.S. 1013, 91 S.Ct. 1252, 28 L.Ed.2d 550 (when accused initiates the conversation, his statements do not result from "interrogations" and are therefore admissible); *United States v. Anthony*, 5 Cir., 1973, 474 F.2d 770 (questions asked by the FBI agent were designed merely to pursue line of inquiry begun by appellant).

We find no merit in the claims of either appellant.

AFFIRMED.