UNITED STATES of America, Appellee,

v.

Tim Joseph KLEIN, Appellant.

No. 78–5177.

United States Court of Appeals,
Fifth Circuit.

April 9, 1979.

Rehearing Denied May 4, 1979.

Tim Joseph Klein, pro se, Thomas A. Wills, Philip Carlton, Jr., Miami, Fla., for appellant.

Jack V. Eskenazi, U.S. Atty., Hugh F. Culverhouse, Jr., Asst. U.S. Atty., Miami, Fla., for appellee.

Before BROWN, Chief Judge, TUTTLE and HILL, Circuit Judges.

JOHN R. BROWN, Chief Judge:

Tim Joseph Klein was indicted in Count I for importing cocaine into the United States in violation of 21 U.S.C.A. §§ 952(a), 960(a)(1) and in Count II for possessing cocaine with the intent to distribute in violation of 21 U.S.C.A. § 841(a)(1) and (b)(1)(A). On January 23, 1978, Klein was convicted by a jury on Count I and acquitted on Count II. On appeal, Klein claims that the District Court erred in denying his motion to suppress evidence seized pursuant to a patdown search at Miami International Airport. He also argues that the Court erred in refusing to suppress certain incriminatory statements made by Klein to Special Agents of the Drug Enforcement Agency (DEA). We conclude that the Court did not err. Therefore, we affirm.

## I. Facts

On October 31, 1977, Klein arrived at Miami International Airport from Bogota, Colombia. Presenting himself for customs inspection, Klein entered the customs line at which United States Customs Service Inspector Norma McMullin was on duty. Following her usual procedure, Inspector McMullin took Klein's customs declaration card and punched it into a computer system, the Treasury Enforcement Capability

System (TECS). She received a print-out indicating that Klein was a suspected marijuana smuggler.

McMullin then began her examination of Klein's baggage. She also asked him some routine questions, from which she learned that Klein had just returned from a four day vacation in Colombia. Klein also informed her that he was employed as a repairman/mechanic. McMullin asked him to remove his leather jacket so that she could read its label to determine whether it had been acquired in Colombia. When Klein removed his jacket, McMullin then noticed that his western-style shirt appeared loose and that he was perspiring. McMullin thought it strange that he should be wearing his leather jacket in what she described as a warm room. She also thought that Klein looked nervous. Because of her suspicions, McMullin decided to request a more extended search of Klein.

She signaled to her supervisor, who assigned Customs Inspector John R. Ryan to conduct the search. Ryan accompanied Klein to an adjacent room and instructed him to remove his jacket. Ryan felt along the outside of Klein's shirt, near the armpit area, and discovered what he thought to be packages of material taped to Klein's underarms. Klein thereupon produced an additional package from the arch of his foot. The material was field tested by Ryan and found to be cocaine. Ryan then advised Klein of his rights and arrested him. Klein indicated that he understood his rights. He refused to sign a waiver form.

Shortly thereafter, Klein was turned over to DEA Special Agent Kenneth Goodman who escorted Klein to a DEA office near the Customs enclosure. In the presence of another DEA Special Agent, Gaston Cairo, Goodman read Klein his *Miranda* rights,

and Klein stated that he understood them. Goodman also advised Klein that he was under arrest for importing cocaine.

When asked by Goodman if he, Klein, would like to tell where he got the cocaine, Klein initially replied "not particularly." Subsequently, Klein told Goodman and Cairo that he had purchased the cocaine in Bogota from an individual known as Orlando. Klein also stated that he had paid $2,300 for the cocaine and had acted alone in the financing and importing. Klein further stated that the cocaine was his own and that he intended to sell it in Broward County. During the questioning. there was also some discussion about bonds, the proceedings that would likely ensue, and about possible penalties that Klein might receive if convicted of drug importation.

## II. The Patdown Search

In this Circuit, the initiation of a border search [1] is governed by the test of "reasonable suspicion." [2]   *United States v. Himmelwright*, 5 Cir., 1977, 551 F.2d 991, cert. denied, 434 U.S. 902, 98 S.Ct. 298, 54 L.Ed.2d 189 (strip search); *United States v. Chiarito*, 5 Cir., 1975, 507 F.2d 1098, *cert. denied*, 423 U.S. 824, 96 S.Ct. 38, 46 L.Ed.2d 40 (frisk search); *United States v. Maggard*, 5 Cir., 1971, 451 F.2d 502, cert. denied, 1972, 405 U.S. 1045, 92 S.Ct. 1330, 31 L.Ed.2d 587 (car search). Whether the requisite degree of suspicion exists depends upon the totality of the circumstances of the particular case. *United States v. Lilly*, 5 Cir., 1978, 576 F.2d 1240, 1245; *United States v. Himmelwright*, 551 F.2d at 995.

In this case, Inspector McMullin testified that a number of factors led her to request a search of Klein's person. Klein seemed nervous and was perspiring, wore his leath-

1. It is indisputable that the customs area at Miami International Airport is not only the "functional equivalent of the border." *See Almeida-Sanchez v. United States*, 1973, 413 U.S. 266, 272–73, 93 S.Ct. 2335, 37 L.Ed.2d 596. It is *the* border for arriving international passengers.

2. The defense has asked us to adopt the "real suspicion" test used by the Ninth Circuit in

strip search cases. *See, e. g., United States v. Guadalupe-Garza*, 9 Cir., 1970, 421 F.2d 876; *Henderson v. United States*, 9 Cir., 1967, 390 F.2d 805. This Court rejected that test in *United States v. Smith*, 5 Cir., 1977, 557 F.2d 1206, *cert. denied*, 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777. That determination is binding on us. Furthermore, we are not concerned with a strip search here.

er jacket in a warm room, upon removing his jacket was seen to be wearing a loose-fitting western-style shirt, was returning from Colombia after a short vacation, and was listed in the TECS report as a suspected marijuana smuggler.

■ Several of these factors correspond with those that we have previously recognized as contributing to the constitutional reasonableness of a particular search or seizure. They are significant in that they are associated with drug smuggling activity.[3] *United States v. Himmelwright*, 551 F.2d at 995–96; *United States v. Forbicetta*, 5 Cir., 1973, 484 F.2d 645, 646, *cert. denied*, 1974, 416 U.S. 993, 94 S.Ct. 2404, 40 L.Ed.2d 772.

■ A number of these factors are present in this case. Klein was traveling alone, returning from a short trip to Bogota, Colombia. *Cf. United States v. Rieves*, 5 Cir., 1978, 584 F.2d 740; *United States v. Smith*, 557 F.2d at 1209; *United States v. Himmelwright*, 551 F.2d at 996; *United States v. Forbicetta*, 484 F.2d at 646. He also appeared unusually nervous. *Cf. United States v. Smith*, 557 F.2d at 1208; *United States v. Chiarito*, 507 F.2d at 1100. Additionally, McMullin observed that Klein's western-style shirt was unusually loose in the midriff area below the armpit, the *particular place* where the contraband was suspected to be, and was, found. *Cf.*

*United States v. Himmelwright*, 551 F.2d at 995.[4] Under the circumstances of this case, the above factors were sufficient to justify a request for a search.[5]

■ Of course, in any Fourth Amendment case, we must consider not only the reasons for initiating a search. We must also consider how the search was conducted. *See* Note, *From Bags To Body Cavities: The Law Of Border Search*, 74 Col.L.Rev. 53 (1974). Here, we find that the relatively unobtrusive nature of the patdown search conducted by Inspector Ryan is an important factor in our finding that the search was constitutional. In this case, Klein was escorted to a private room. Except for his leather jacket, he was not made to remove any of his other clothes.[6] Only the outside of his shirt, along the rib area, was frisked. While perhaps a ticklish situation, this is obviously not the sort of experience that one who undergoes a strip search must endure. We need not decide today whether the same factors that justify the patdown search would justify a more intrusive search. *Cf. United States v. Lilly*, 576 F.2d at 1245 ("The more intrusive is a particular search or seizure, the heavier is the government's burden of proving the reasonableness of that search or seizure.").

Because we find that there was sufficient "reasonable suspicion" to justify the initial

---

**3.** Many of these characteristics correspond to those in the "smuggling profile" compiled by customs officials. The profile is based upon characteristics frequently exhibited by persons involved in drug smuggling. The "smuggling profile" was not in evidence in this case. At any rate, the resemblance to the profile does not determine the constitutional validity of a search. That depends upon the facts in each case. *United States v. Smith*, 557 F.2d at 1209 n.4; *United States v. Himmelwright*, 551 F.2d at 995.

**4.** Defendant makes much of Inspector Ryan's testimony that Klein's shirt was no more loose than that worn by defense counsel at the suppression hearing. See R., vol. II, at 44–45. In the first place, of course, Inspector Ryan's observations are not at issue. It is the reasonableness of McMullin's observations that is crucial. In addition, there is nothing in the record to indicate that defense counsel was wearing a western-style shirt at the suppression hearing.

Thus, the comparison between his own and Klein's shirt is not particularly helpful.

**5.** The defense argues that the TECS report cannot be considered by this Court to justify the patdown search of Klein because the report itself was not introduced into evidence and because the Court does not know the basis for the report's allegation that Klein was a suspected marijuana smuggler. We need not consider these arguments since we find justification for the search independent of the TECS report.

**6.** Once Inspector Ryan discovered what he thought to be suspicious packages taped to Klein's body, he then directed Klein to remove his shirt so that the packages could be examined. In light of the preceding events, this further inquiry was not improper. The initial patdown, which triggered the further investigation, is the search upon which the Fourth Amendment issue turns.

search, and because we find that the conduct of the search was also reasonable, we hold that there was no Fourth Amendment violation in this case.

### III. The Interrogation

■ Klein challenges the admission of the incriminating statements made to Special Agent Goodman while at the DEA's airport office. Klein claims that the statements were induced by a promise of reward, i. e., that he would be treated more leniently if he cooperated with the agents. Relying on *Miranda v. Arizona*, 1966, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694, Klein also argues that his statements were illegally obtained through continued interrogation conducted after he had invoked his right to remain silent. Finally, he asserts that he was inadequately advised of his *Miranda* rights. We have reviewed all the relevant testimony concerning Klein's statements to the DEA agents. From this evidence, we have determined that the District Court did not err in admitting the incriminating statements made by Klein.

### A. Alleged Promise Of Reward

In the first place, the statements do not appear to have been induced by a promise of reward. As is so often the case, the evidence is in conflict as to exactly what the government agents said to Klein. The defense claims that the agents suggested to him that the amount of his bond and sentence would be less if he would cooperate with them.[7] The government, however, contends that Goodman merely stated that if Klein cooperated with the agents they would so inform the Court and prosecuting officials but that the information would not necessarily affect Klein's case.[8] The United States Magistrate and the District Court were entitled to credit Goodman's testimony and reject Klein's, and this credited testimony does not show an illegal promise of reward. *See United States v. Rieves*, 584 F.2d at 745.

Moreover, although the record is unclear as to exactly when during the questioning period these asserted "inducements" occurred, Klein's own testimony shows that

7. Klein: Well, Agent Goodman said, you know, I'd probably get three years. Then the other one said, no, we'll go for 15.

Defense Counsel: What did agent Goodman say as to why you would get only three years?

Klein: If I would cooperate with them, they wanted to know the big people, and that there's no reason why I should do time being a little guy, that they wanted, you know, to meet the big people and get them.

\* \* \* \* \* \*

Defense Counsel: At any point in time did Goodman or any other agent in your presence discuss a $50,000 bond with anybody?

Klein: Over the phone they were asking and then talking to each other how much they should ask for, because Agent Cairo said that I was not cooperating enough, and he'd ask for a higher one, and then Goodman said, "No, no; he doesn't need it that high."
1st Supp.R. at 147, 149.

8. Defense Counsel: Was there any discussion with Mr. Klein concerning what effect his alleged cooperation would have in terms of the ultimate disposition or imposition of sentence in this cause?

Goodman: We told Mr. Klein that any and all cooperation would be duly brought to the attention of the Court, to the United States Attorney prosecuting the case, to the probation officer who does a presentence investi-

gation, and that it would be considered and the Judge, of course, and that all this, any cooperation would be taken into consideration at the time of sentence.

Defense Counsel: Was there not a suggestion made that in return for his cooperation and/or a plea of guilty, then he could reasonably anticipate that he would not receive as severe a sentence as though if he didn't cooperate?

Goodman: I told him that we could not guarantee that, but that was very possible, that the sentence could be.

\* \* \* \* \* \*

Defense Counsel: Was it not suggested to him that it was very possible that things would go better for him if he cooperated rather than if he was obstinate and bull-headed?

Goodman: No, no, he didn't tell me.

Defense Counsel: That was never suggested?

Goodman: Not that things would go better. There are many factors I told him depending upon which judge the case is assigned to and what cooperation, if any, he could furnish, and like I told him, we could not make him any promises at all. We could just explain to him that cooperation is usually considered in a favorable light by the court.
R., vol. II, at 53–54, 54–55.

his inculpatory remarks were made prior to the alleged inducements.[9] That being so, we would be very hard put to find that Klein's remarks were induced by "promises" that had not yet been made.

### B. Alleged Interrogation After Invocation Of Right To Silence

■ In addition, we reject the argument that Klein was illegally questioned subsequent to his invocation of his right to remain silent. Instead, we conclude that Klein waived his right to remain silent.

■ Klein himself admitted that he was twice advised of his rights, and he also testified that he understood those rights. Nonetheless, Klein did not refuse to answer questions. Nor did he seek an attorney or ask the agents to stop questioning him.[10] Moreover, Klein cannot contend that his compliance was induced by fear or compulsion, for, according to his own testimony, he was "calm" and "relaxed" during the questioning. 1st Supp.R. at 150. Under these circumstances, we find that there was no illegal interrogation.

### C. Adequacy of Miranda Warnings

■ Finally, Klein challenges the admission of his statements on the grounds that he was not given adequate *Miranda* warnings because Special Agent Goodman testified that he read Klein his rights from a card but did not testify as to the contents of the card. See *Moll v. United States*, 1969, 5 Cir., 413 F.2d 1233, 1238 ("The government's burden [of proving compliance with *Miranda*] may not be met by presumptions or inferences that when police officers read to an accused from a card they are reading *Miranda* warnings or that what is read, without revelation of its contents, meets constitutional standards."). This argument is without merit. The government does not depend merely upon a "presumption" that *Miranda* warnings were read, for Klein himself admitted that he was advised of his rights by Special Agent Goodman. 1st Supp.R. at 145. Moreover, Goodman did not merely testify that he read from a card. He also acknowledged that the card contained the standard *Miranda* warnings. *Id.* at 141. At any rate, whether the government met its burden of proof in showing that Goodman advised Klein of his rights would not necessarily affect the outcome of the case since, almost immediately preceding the interrogation, Inspector Ryan advised Klein of his rights,[11] and the adequacy of this advice is unchallenged on appeal.

---

9. According to Klein's version of the events leading to his statements, they following almost immediately agent Goodman's giving of *Miranda* warnings:

   Klein: [H]e [Goodman] read me my rights and asked me if I understood them, and I said, "Yes." Then he asked me if I wanted to tell him where I got it, and I said not particularly, really, and then they kept fingerprinting me.
   Defense Counsel: Now, the questioning of you is while the fingerprinting is going on?
   Klein: Right.
   Defense Counsel: Go ahead.
   Klein: And then he asked me where did I get it, and I just said I got in in Bogota from a taxidriver, and then he asked me could I sell this on the street, and I did not answer that, and he said—let me see—he asked me how much I paid for it, and I told him, and then he said, "Are you going to sell this in Broward County, or would you be able to sell this in Broward County," is what he said, and I did not answer him at that time or at any time about that question.
   1st Supp.R. at 145–46.

10. The defense argues that Klein's refusal to sign a waiver form and his statement that he did "not particularly" want to tell where he got the cocaine constituted an invocation of his right to silence. Of course, the mere refusal to sign a waiver form does not make further inquiry illegal. *United States v. McDaniel*, 5 Cir., 1972, 463 F.2d 129, *cert. denied*, 1973, 413 U.S. 919, 93 S.Ct. 3046, 37 L.Ed.2d 1041; *United States v. Phelps*, 5 Cir., 1971, 443 F.2d 246. Additionally, where the equivocal "not particularly" language was apparently almost immediately followed by the incriminating remarks, we cannot say that it amounted to a refusal to answer the agents' questions.

11. Defense Counsel: Did Agent Ryan or Customs Official Ryan read you anything about the Constitutional Rights, the right to be quiet, the right to have a lawyer, or the right to stop questioning at any time?
    Klein: Yes.
    Defense Counsel: Stuff like that?
    Klein: Yes, he did.
    1st Supp.R. at 144.

We find no reversible error in this case. AFFIRMED.