UNITED STATES of America,
Plaintiff-Appellee,

v.

Gloria Antelo DE GUTIERREZ,
Defendant-Appellant.

No. 80–5991.

United States Court of Appeals,
Fifth Circuit.*
Unit B

Feb. 8, 1982.

Weiner, Robbins, Tunkey & Ross, P.A., Geoffrey C. Fleck, Richard Sharpstein, Miami, Fla., for defendant-appellant.

Ana-Maria Carnesoltas, Asst. U. S. Atty., Miami, Fla., for plaintiff-appellee.

Before FAY, FRANK M. JOHNSON, Jr. and THOMAS A. CLARK, Circuit Judges.

THOMAS A. CLARK, Circuit Judge:

Gloria Antelo De Gutierrez was charged in a two-count indictment with knowingly and intentionally importing cocaine into the United States from a place outside thereof in violation of 21 U.S.C. §§ 952(a), 960(a)(1), and 18 U.S.C. § 2 (Count I); and knowingly and intentionally possessing cocaine with the intent to distribute in violation of 21 U.S.C. § 841(a)(1) (Count II). De Gutierrez was convicted in a bench trial on both counts and was sentenced to four years imprisonment to be followed by three

* Former Fifth Circuit case, Section 9(1) of Public    Law 96–452—October 14, 1980.

years special parole as to each count to be served concurrently. She now appeals from her convictions, claiming that contraband evidence should have been suppressed because it was obtained through an unlawful strip search. We affirm.

On August 22, 1980, Customs Inspector Anthony Knapik was conducting primary inspections at the baggage clearance section of the Miami International Airport. At approximately 7:00 a. m., L.A.B. Flight Number 960 (Flight 960) arrived from Santa Cruz, Bolivia. Flight 960 was considered by Customs personnel to be a "high risk" flight for cocaine trafficking because it had a very high incidence of cocaine traffickers traveling aboard as passengers. During the week preceding August 22, 1980, cocaine had been seized three times from passengers arriving at Miami aboard Flight 960.

De Gutierrez was a passenger aboard Flight 960 and thus had to pass through the baggage clearance section where Inspector Knapik was working. Inspector Knapik first observed De Gutierrez at approximately 7:00 a. m. while he was inspecting another passenger. De Gutierrez was the next passenger in Inspector Knapik's line and was standing 10 to 12 feet to his left with her hands clasped across her waist and her purse hanging in front of her body concealing the lower portion of her abdomen.

Inspector Knapik's station consisted of a two-level counter, a podium approximately 46 inches high, 30 inches wide, and 48 inches long, and a table immediately to the right of and lower than the podium. When De Gutierrez approached the station for inspection, she stood very close to and in front of the podium, facing Inspector Knapik. Only the portion of her body from the waist up was visible to Inspector Knapik.

As Inspector Knapik inspected De Gutierrez' documents, he asked her in Spanish several routine questions such as how long she was planning to stay in the United States, what she was bringing in with her, and whether she expected to leave anything in the United States. Inspector Knapik was not fluent in Spanish but knew enough to understand the usual answers given by Spanish-speaking passengers. De Gutierrez responded to Inspector Knapik's questions in such a low voice that he had to repeat each question three or four times, giving him the impression that she was not trying to communicate with him. He finally determined that she had come to the United States to purchase clothes or household items, that she would be in the United States for two weeks, and that she would be staying at the Everglades Hotel in Miami.

De Gutierrez presented one suitcase and her handbag for inspection. As Inspector Knapik took her suitcase and placed it on the table next to the podium, he stepped to his right and stood in front of the table. De Gutierrez then turned about 30 degrees to her right and stood with her left shoulder against the podium, leaving only the left side of her body exposed to Inspector Knapik's view.

The inspection of De Gutierrez' documents and suitcase disclosed the following factors that matched the profile of the cocaine traffickers who had arrived from Bolivia aboard Flight 960 the previous week: her passport reflected a one-entry visa; her Customs Declaration Form indicated that she was traveling alone; her airline ticket had been paid for in cash and had an open return date; and her suitcase contained a very small amount of clothing (only ten percent full) in light of the length of her anticipated two-week visit. Two additional factors correlated with the profile: De Gutierrez was in her thirties, the same age range as the previously discovered traffickers, and she planned to stay at the Everglades Hotel as did the other traffickers.

Inspector Knapik testified that he became suspicious that De Gutierrez might be a drug courier because she fit the profile of previous couriers on Flight 960, because she seemed to be making an obvious attempt to conceal the lower portion of her abdomen from his view, and because she appeared reluctant to answer his questions. On the basis of this suspicion, he went to his supervisor, explained the factors that gave rise to his suspicion, and requested that a personal

examination of De Gutierrez' body be conducted by a female inspector.

De Gutierrez was taken to a secondary inspection room. A female Customs inspector (Inspector Clark) then was directed to go to the secondary inspection room and conduct a search of De Gutierrez' body. Also in the room were two other female Customs inspectors, one of whom told Inspector Clark that De Gutierrez was carrying drugs on her body. Inspector Clark asked De Gutierrez in Spanish to remove her dress, and De Gutierrez complied. Underneath her dress De Gutierrez was wearing a body girdle. Inspector Clark asked De Gutierrez to remove the body girdle but De Gutierrez did not comply. Inspector Clark repeated the request and again De Gutierrez did not comply. Inspector Clark thereupon began pulling the top of the body girdle down, at which point De Gutierrez herself finished removing the garment.

As De Gutierrez removed the body girdle, Inspector Clark observed a cloth bag concealed under the girdle between De Gutierrez' legs. When the body girdle was removed completely, the cloth bag fell to the floor. Inspector Clark picked up the bag and placed it on a table. One of the other female inspectors in the room opened the bag and performed a field test on its contents, which tested positive for cocaine.[1] De Gutierrez was arrested and subsequently was indicted both for importing cocaine into the United States, 21 U.S.C. §§ 952(a), 960(a)(1); 18 U.S.C. § 2, and for possessing cocaine with the intent to distribute, 21 U.S.C. § 841(a)(1).

Prior to trial, De Gutierrez filed a motion to suppress the contraband evidence on the ground that it was obtained through an unreasonable search in violation of the fourth amendment. A suppression hearing was held before a United States magistrate, who recommended that the district court

deny the motion to suppress. The district court followed the magistrate's recommendation and denied the motion. The case thereafter proceeded to trial. After the parties waived jury trial and stipulated to all evidence, the trial judge found De Gutierrez guilty on both counts. De Gutierrez now appeals from her convictions. The sole issue before us is whether it was error for the trial court to deny De Gutierrez' motion to suppress the contraband evidence obtained through the strip search of her body.

■■■ We begin by noting that De Gutierrez does not, nor could she, dispute that the strip search occurred at the "functional equivalent of the border."[2] See Almeida-Sanchez v. United States, 413 U.S. 266, 272–73, 93 S.Ct. 2535, 2539, 37 L.Ed.2d 596 (1973). Because of the need for national self-protection, border searches are placed "in a category apart from other searches." United States v. Sandler, 644 F.2d 1163, 1165 (5th Cir. 1981) (en banc). "[A]ll persons coming into the United States from foreign countries shall be liable to detention and search by authorized officers or agents of the Government under [Treasury] regulations." 19 U.S.C. § 1582. Customs officers are authorized to conduct searches at the border by 19 U.S.C. § 482, which provides that such officers "may stop, search and examine . . . any vehicle, beast, or person, on which or whom he or they shall suspect there is merchandise which is subject to duty, or shall have been introduced into the United States in a manner contrary to law. . . ." This statutory authorization to search is subject to the fourth amendment's reasonableness requirement. Border searches, however, "rest on different rules of constitutional law than do domestic regulations." United States v. Sandler, supra, 644 F.2d at 1165. Thus, this circuit has declared that border searches require nei-

---

1. Subsequent analysis by a Drug Enforcement Administration laboratory revealed that the bag contained 1,520 grams net weight of ninety-two percent strength cocaine hydrochloride.

2. This circuit on numerous occasions has considered the Customs area at Miami International Airport to be the functional equivalent of the

border. See, e.g., United States v. Walters, 591 F.2d 1195 (5th Cir. 1979); United States v. Martinez, 577 F.2d 960 (5th Cir. 1978); United States v. Barger, 574 F.2d 1283 (5th Cir. 1978); United States v. Himmelwright, 551 F.2d 991 (5th Cir. 1977).

ther "probable cause," *Perel v. Vanderford,* 547 F.2d 278, 280 (5th Cir. 1977), nor "real suspicion," *United States v. Smith,* 557 F.2d 1206, 1208 (5th Cir. 1977), *cert. denied,* 434 U.S. 1073, 98 S.Ct. 1259, 55 L.Ed.2d 777 (1978).

The degree of suspicion required to justify a border search depends upon the kind of search involved. Our cases have recognized three distinct kinds of border searches of persons: simple frisks or pat-downs, strip searches, and body-cavity searches. These three categories are subject to different standards because of the varying degrees of intrusion that they entail. In a recent en banc decision, we held that a simple frisk or pat-down of a person crossing the border may be based on "mere suspicion" because of the relatively low degree of intrusion involved. *United States v. Sandler,* 644 F.2d 1163, 1167 (5th Cir. 1981) (en banc). The case under review, however, involves a strip search and thus "presents a degree of intrusion which requires more than mere suspicion to justify." *Id.* The well-established rule in this circuit is that a strip search conducted at the border meets the requirements of the fourth amendment if it is supported by "reasonable suspicion" on the part of the customs agent. *United States v. Walters,* 591 F.2d 1195 (5th Cir. 1979); *United States v. Barger,* 574 F.2d 1283, 1285 (5th Cir. 1978); *United States v. Olcott,* 568 F.2d 1173, 1175 (5th Cir. 1978); *United States v. Himmelwright,* 551 F.2d 991, 995 (5th Cir. 1977). Therefore, the issue before us can be stated concisely as whether reasonable suspicion existed to justify the strip search of De Gutierrez.

The determination whether reasonable suspicion exists must be made on a case-by-case basis: "As the courts have universally recognized in these fourth amendment cases, each case must finally turn on its own facts." *United States v. Himmelwright, supra,* 551 F.2d at 995. Examining the particular facts of this case, we find several factors upon which the strip search of De Gutierrez was based, one such factor being her resemblance to a drug courier profile.

De Gutierrez argues, however, that reasonable suspicion cannot be based upon resemblance to a drug courier profile. Although this court in *United States v. Himmelwright,* 551 F.2d 991 (5th Cir. 1977), intimated that resemblance to such a profile *standing alone* would not justify a body search, the *Himmelwright* court also held that correlation with a drug courier profile may be considered as one factor, and that the conjunction of this and other factors can constitute reasonable suspicion supporting a strip search at the border. *Id.* at 995, 996 n.13. Thus, De Gutierrez' resemblance to the drug courier profile is one factor that may be considered in determining whether Inspector Knapik had reasonable suspicion upon which to order the strip search.

In this case, then, three factors were present upon which Inspector Knapik could base his decision to request a strip search: De Gutierrez' resemblance to the drug courier profile, her apparent attempt to conceal her lower abdomen from view, and her reluctance to answer Inspector Knapik's questions. In *United States v. Himmelwright, supra,* this court was presented with circumstances similar to those present in this case: the defendant, who was passing through Customs at Miami International Airport after arriving on a flight from Colombia, resembled a drug courier profile and gave evasive and contradictory answers when questioned by Customs officials. The court found that these factors taken in conjunction provided a valid basis for Customs officials to conduct a strip search.

We find that the three factors known to Inspector Knapik in this case likewise could arouse the reasonable suspicion required to justify a strip search of De Gutierrez. Therefore, we hold that the search was lawful and that the trial court was correct to deny De Gutierrez' motion to suppress the contraband evidence obtained during that search.

De Gutierrez also argues in passing that the strip search was conducted in an unreasonable manner and thus should be declared

unlawful. We find no merit in this contention. For the reasons expressed in this opinion, the appellant's convictions are AFFIRMED.