[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 08-12662
_____

FILED
U.S. COURT OF APPEALS
ELEVENTH CIRCUIT
APRIL 21, 2009
THOMAS K. KAHN
CLERK

D. C. Docket No. 07-00271-CR-01-ODE-1

UNITED STATES OF AMERICA,

Plaintiff-Appellee,

versus

JORGE LOPEZ-GARCIA,

Defendant-Appellant.

_____

Appeal from the United States District Court
for the Northern District of Georgia

_____

(April 21, 2009)

Before BLACK and MARCUS, Circuit Judges, and BUCKLEW,* District Judge.

_____

* Honorable Susan C. Bucklew, United States District Judge for the Middle District of Florida, sitting by designation.

MARCUS, Circuit Judge:

Defendant Jorge Lopez-Garcia appeals from his conviction for having been unlawfully found in the United States after having been previously removed and deported, in violation of Title 8 U.S.C. §§ 1326(a) and (b)(2). The district court denied Lopez-Garcia's motion to suppress statements he made regarding his immigration status to an Immigration and Customs Enforcement ("ICE") agent while in police custody after being arrested on unrelated drug charges. Lopez-Garcia claims that his statements, and certain documentary evidence regarding his immigration status, were inadmissible because they were tainted by the alleged unconstitutionality of his initial arrest. He also argues that his statements should have been suppressed because he was not first properly informed of his Miranda rights. Finally, Lopez-Garcia says that the district court erred in enhancing his sentence under the United States Sentencing Guidelines based on his prior conviction for a firearms offense under Georgia law.

After thorough review, we affirm.

## I. Factual and Procedural Background

The basic facts are these: on June 18, 2007, Police Officer Jesus Maldonado was driving his patrol car near the intersection of Allgood Road and Birney Street

2

in Marietta, Georgia. The area is well-known for narcotics activity -- particularly for street-level, hand-to-hand drug dealing. As Officer Maldonado turned onto Birney Street, he observed a gold-colored four-door vehicle stopped in the right-hand lane of the roadway. A man was seen standing outside the vehicle, leaning into the passenger side window and speaking to the driver. As Officer Maldonado's cruiser approached, the man at the car's window looked up, turned around, and walked away; and the car drove away from the officer's cruiser.

Officer Maldonado followed the vehicle and pulled it over a short time later, explaining to the driver -- later determined to be Lopez-Garcia -- that he had violated a traffic law by stopping in the roadway on Birney Street. Asked for his driver's license, Lopez-Garcia produced a Mexican license bearing the name "Emanuel Sanchez-Lopez." In response to Officer Maldonado's questions, Lopez-Garcia explained that he had resided in the United States for several years, and that the person to whom he had been speaking on Birney Street was his brother-in-law.

Officer Maldonado ran a check on the license and found that although the driver had been issued identification in Georgia, he was unlicensed under the name "Emanuel Sanchez-Lopez." Maldonado returned to Lopez-Garcia's vehicle and asked whether he was in possession of any illegal narcotics or weapons.

Lopez-Garcia answered that he had no drugs or weapons, and he consented to a search of his person and his vehicle. Under one of the vehicle's seats, Maldonado found a bulb-shaped glass tube containing a white residue that he believed to be methamphetamine. At that point, Maldonado placed Lopez-Garcia under arrest for possession of methamphetamine, and took him to the Cobb County Jail.

As part of the ordinary booking process, the Cobb County Jail ordered that an Immigration Action Query ("IAQ") be performed on Lopez-Garcia. The IAQ reveals an individual's name and aliases, his date and place of birth, as well as other details concerning his immigration status, such as whether he had previously been deported, removed, or excluded, and whether there was any record of his re-entry into the country. The results of the IAQ were not received until the following day, June 19, 2007.

On June 19 -- but before receiving the IAQ -- Sheriff's Deputy Paul Diaz, an officer assigned to the jail's Immigration and Customs Enforcement unit, met with Lopez-Garcia. As an ICE agent, Deputy Diaz's role was to identify illegal aliens and facilitate their removal from the country. He regularly received a list of individuals booked at the jail who had been born outside the United States. Based on the charges against them, and initial checks into their immigration status, Diaz would decide which of the detainees to interview. The purpose of the interviews

4

was to determine whether the detainee had the documentation necessary to remain in the United States. If not, Diaz would arrange for the individual to appear before an immigration judge or, if the defendant waived his appearance, to facilitate his removal. Notably, Diaz's purpose was not to initiate criminal charges against those present in the country illegally. Indeed, Diaz lacked the authority to decide whether to bring criminal charges against any of the individuals whom he interviewed.

Prior to meeting with the defendant, Diaz conducted a preliminary computer search and learned that Lopez-Garcia had been born outside of the United States. Diaz did not provide Lopez-Garcia with Miranda warnings at any point during the interview. Rather, he explained to Lopez-Garcia that his purpose was to determine whether he had immigration papers. Diaz informed Lopez-Garcia that if he did not have papers, he had the option of seeing an immigration judge or being removed. Diaz also told Lopez-Garcia that he could expedite his removal by signing a waiver of appearance. In response to Diaz's questions, Lopez-Garcia stated that his name was "Emanuel Sanchez," that he was from Mexico, and that he was present in the United States illegally.

After the June 19, 2007 meeting, Diaz received Lopez-Garcia's IAQ. It indicated that Lopez-Garcia had been deported, removed, or excluded on July 12,

5

2003, and that no record of a legal entry had been found. Diaz then ordered Lopez-Garcia's alien file ("A-File").[1] After receiving the A-File, he questioned Lopez-Garcia for a second time, on June 29, 2007. The second interview took place in an ICE office within the jail. In addition to Diaz and Lopez-Garcia, the meeting was attended by another ICE Agent, Alberto Prieto. Neither of the agents was armed, and Lopez-Garcia appeared calm at all times. This time, Diaz read Lopez-Garcia Miranda warnings from a standardized form, which he translated into Spanish, and then gave Lopez-Garcia an opportunity to ask questions. Lopez-Garcia indicated that he understood the warning and signed a form waiving his rights. In response to Diaz's questions, Lopez-Garcia stated that his date of birth was April 13, 1977; that he was born in Cardenas, Tabasco, Mexico; that he was a Mexican citizen; that he had been removed on one prior occasion by the INS; and

---

[1] An alien file contains information obtained on each occasion that an alien has passed through the U.S. immigration and inspection process. United States v. Farias-Gonzalez, 556 F.3d 1181, 1184 n.2 (11th Cir. 2009). Hence, A-Files typically include evidence of an individual's prior deportations from, or lawful entries into, the country. Id. In addition, A-Files contain the alien's fingerprints and his photograph. Id.

that he was in the country illegally, having entered the United States in May 2007 via Brownsville, Texas.

The questioning was conducted in Spanish and lasted for roughly ten minutes. Diaz then presented Lopez-Garcia with a sheet containing all of the questions he had been asked and all of the answers he had given. Lopez-Garcia was told that he was not required to sign the document, but he nevertheless chose to do so.

Lopez-Garcia was later indicted on federal charges of having been unlawfully found in the United States after having been previously removed and deported, in violation of 8 U.S.C. §§ 1326(a) and (b)(2). He moved to suppress the statements he had made to Diaz on June 19, 2007 and June 29, 2007 regarding his immigration status; he also moved to suppress the documentary evidence (i.e., the IAQ and his A-File) that had been obtained after his arrest. The matter was referred to a magistrate judge, who held an evidentiary hearing on the motions and issued a Report and Recommendation ("R&R") on January 14, 2008. The R&R concluded that Officer Maldonado's decision to stop Lopez-Garcia's vehicle violated the Fourth Amendment because it was not based on either probable cause or reasonable suspicion. As a result, the R&R recommended that evidence obtained at the scene of the arrest be suppressed. However, the R&R concluded

7

that Lopez-Garcia's subsequent statements, as well as the IAQ and A-File, should not be suppressed. The district court reviewed the R&R, rejected Lopez-Garcia's objections, and adopted the magistrate judge's conclusions.

On February 12, 2008, Lopez-Garcia entered a conditional plea of guilty to the indictment, reserving the right to appeal the district court's rulings on his motion to suppress pursuant to Fed. R. Crim. P. 11(a)(2). On April 30, 2008, the district court sentenced Lopez-Garcia to a term of fifty-two months of imprisonment. The sentence was based in part on the district court's determination that Lopez-Garcia was subject to a sixteen offense-level enhancement for the prior commission of a felony firearms offense.

## II.

"A district court's ruling on a motion to suppress presents a mixed question of law and fact." United States v. Santa, 236 F.3d 662, 668 (11th Cir. 2000) (internal quotation marks omitted). We review the district court's findings of fact for clear error and its application of the law to the facts de novo. Farias-Gonzalez, 556 F.3d at 1185. Similarly, in assessing a district court's imposition of an offense-level enhancement, we review the court's "findings of fact for clear error and its application of the Sentencing Guidelines de novo." United States v. Rendon, 354 F.3d 1320, 1329 (11th Cir. 2003).

Lopez-Garcia first argues that the district court erred in denying his motion to suppress the statements he made to Diaz on June 19, 2007 and again on June 29, 2007 and the documentary evidence (the IAQ and alien file) that Diaz obtained regarding his identity and immigration status. According to Lopez-Garcia, all of this evidence was the fruit of the poisonous tree, tainted by the unconstitutionality of his initial seizure. He also claims that his statements should have been suppressed because he was not given <u>Miranda</u> warnings prior to making the June 19 statement.

## A. The Seizure & Arrest

Lopez-Garcia says that his Fourth Amendment rights were violated when he was stopped by Officer Maldonado. We disagree. The Fourth Amendment provides that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated." U.S. Const. amend. IV. "Temporary detention of individuals during the stop of an automobile by the police, even if only for a brief period and for a limited purpose, constitutes a 'seizure' of 'persons' within the meaning of this provision." <u>Whren v. United States</u>, 517 U.S. 806, 809-10 (1996). It is by now well established that a "law enforcement officer may conduct a brief investigative stop of a vehicle, analogous to a <u>Terry</u>-stop, if the seizure is justified by specific

9

articulable facts sufficient to give rise to a reasonable suspicion of criminal conduct." United States v. Harris, 928 F.2d 1113, 1116 (11th Cir. 1991) (internal quotation marks omitted).

An "inchoate and unparticularized suspicion or hunch of criminal activity" is not sufficient to meet the reasonable suspicion standard. United States v. Yuknavich, 419 F.3d 1302, 1311 (11th Cir. 2005) (internal quotation marks omitted). Rather, an "officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant [the] intrusion." Id. (internal quotation marks omitted). Furthermore, "[w]hen making a determination of reasonable suspicion, we must look at the totality of the circumstances of each case to see whether the detaining officer has a particularized and objective basis for suspecting legal wrongdoing." Id. (internal quotation marks removed). Adopting this perspective is important, as the Supreme Court has observed, because it "allows officers to draw on their own experience and specialized training to make inferences from and deductions about the cumulative information available to them that might well elude an untrained person." United States v. Arvizu, 534 U.S. 266, 273 (2002) (citations and quotation marks omitted).

Here, Officer Maldonado's suspicion that the defendant was engaged in a hand-to-hand drug transaction was supported by several specific, objective, and articulable facts. First, Lopez-Garcia's vehicle was stopped in the roadway; second, the activity took place in a high-crime area known specifically for street-level, hand-to-hand drug transactions; third, an unknown person was seen leaning into the window and having a conversation with the defendant; and fourth, once they saw Officer Maldonado, the individual abruptly withdrew from the car window, and Lopez-Garcia began to drive away. Taking all of these facts in concert, we are satisfied that Officer Maldonado had reasonable suspicion to stop Lopez-Garcia's vehicle. See also United States v. Briggman, 931 F.2d 705, 707, 709 (11th Cir. 1991) (officer had reasonable suspicion to stop driver sitting in parked car with headlights on in the early morning hours in a lot near several businesses that had recently been robbed).

The district court was surely correct in observing that a defendant's presence in a high-crime area, standing alone, is insufficient to establish reasonable suspicion. But Maldonado's suspicion was not just based on the area in which the conduct was observed; it was also based on specific features of the individuals' conduct. Nor does the fact that Officer Maldonado never witnessed any actual exchange between Lopez-Garcia and his brother-in-law preclude a

11

finding of reasonable suspicion. Indeed, no single factor is dispositive in determining whether reasonable suspicion exists in any particular context. Rather, the "determination whether reasonable suspicion exists must be made on a case-by-case basis," and each Fourth Amendment determination must "finally turn on its own facts." United States v. De Gutierrez, 667 F.2d 16, 19 (11th Cir. 1982) (internal quotation marks omitted).

Maldonado's arrest of Lopez-Garcia for possession of methamphetamine also comported with the Fourth Amendment. The "reasonableness of a seizure or arrest under the Fourth Amendment turns on the presence or absence of probable cause." Case v. Eslinger, 555 F.3d 1317, 1326 (11th Cir. 2009) (internal quotation marks omitted). "Probable cause to arrest exists when law enforcement officials have facts and circumstances within their knowledge sufficient to warrant a reasonable belief that the suspect had committed or was committing a crime." Skop v. City of Atlanta, Ga., 485 F.3d 1130, 1137 (11th Cir. 2007) (internal quotation marks omitted). Based on the substance and the paraphernalia recovered from the consensual search of Lopez-Garcia's vehicle, Maldonado reasonably believed that the defendant was in possession of methamphetamine.[2]

_____

[2] We note in passing that the government also claims that Officer Maldonado had probable cause to stop Lopez-Garcia's vehicle. "Under the Fourth Amendment, a decision to stop an automobile is reasonable where the police have probable cause

**B.** **The June 19, 2007 Statement**

Lopez-Garcia argues that the statements he made to Officer Diaz on June 19, 2007 should have been suppressed for two reasons. First, he claims that the statements were tainted under the fruit of the poisonous tree doctrine by the violation of his Fourth Amendment rights that occurred when he was initially stopped and arrested by Officer Maldonado. Second, he claims that Officer Diaz violated his Fifth Amendment rights by failing to Mirandize him prior to the interview.

Lopez-Garcia's Fourth Amendment fruit of the poisonous tree argument plainly collapses since, as we have just explained, his Fourth Amendment rights

---

to believe that a traffic violation occurred." United States v. Simmons, 172 F.3d 775, 778 (11th Cir. 1999) (citing Whren v. United States, 517 U.S. 806, 810 (1996)). The government argues that Officer Maldonado had probable cause to believe that Lopez-Garcia had violated section 40-6-203 of the Georgia Code when he stopped in the roadway on Birney Street. The district court correctly rejected this claim. Contrary to the government's characterization, section 40-6-203 does not prohibit stopping a vehicle in a roadway without more; rather, it prohibits stopping in a roadway in certain locations or under certain conditions: for example, on a bridge, Ga. Code. Ann. § 40-6-203(a)(1)(G), or a crosswalk, id. § 40-6-203(a)(1)(D), or "[a]longside or opposite any street excavation or obstruction when stopping, standing, or parking would obstruct traffic," id. § 40-6-203(a)(1)(F), or on "the roadway side of any vehicle stopped or parked at the edge of a curb of a street," id. § 40-6-203(a)(1)(A). The government has not alleged that Lopez-Garcia stopped his vehicle under any of these particular circumstances, and on this record we think the government has failed to show any traffic basis on which Maldonado could have had probable cause to stop Lopez-Garcia's vehicle.

13

were never violated. Since his seizure and arrest were constitutional, neither of his subsequent statements was tainted by those events. But, even if Lopez-Garcia's Fourth Amendment rights had been violated, his statements were too attenuated from his arrest to be regarded as fruit of the poisonous tree. In determining whether evidence is tainted by a prior violation of constitutional rights, we ask "whether, granting establishment of the primary illegality, the evidence to which instant objection is made has been come at by exploitation of that illegality or instead by means sufficiently distinguishable to be purged of the primary taint." United States v. Delancy, 502 F.3d 1297, 1309 (11th Cir. 2007) (quoting Wong Sun v. United States, 371 U.S. 471, 488 (1963)). This inquiry is fact-sensitive, and no single fact is decisive. However, we have enumerated three non-exclusive factors to guide the inquiry into whether a defendant's consent was tainted by his illegal arrest: "[1] the temporal proximity of the seizure and the consent, [2] the presence of intervening circumstances, and, particularly, [3] the purpose and flagrancy of the official misconduct." Id. (internal quotation marks omitted).

Based on examination of these factors, we agree with the district court's conclusion that Lopez-Garcia's statements to Diaz were too removed from the arrest to have suffered any taint. To begin with, the temporal proximity between the two events is limited: Lopez-Garcia's statements to Diaz were not made until

14

the day after the arrest. To be sure, there is no hard-and-fast rule for determining how much time must have passed before the link between an unlawful arrest and a confession can be considered sufficiently attenuated. Id. at 1310. Nevertheless, we have said that "[i]f only a short period of time has passed, a court is more likely to consider the consent as a 'poisonous fruit' of the illegal act." Id. Thus, we have observed that the "amount of time found sufficient to meet the temporal proximity factor ranges from immediate or 'close in time,' to three minutes, to two hours." Lawhorn v. Allen, 519 F.3d 1272, 1291 (11th Cir. 2008) (citations omitted); United States v. Chanthasouxat, 342 F.3d 1271, 1280 (11th Cir. 2003) (period of three minutes between constitutional violation and confession favored exclusion). When compared with these other decisions, the temporal proximity in this case militates against a finding that Lopez-Garcia's statements were tainted. See also United States v. Stark, 499 F.3d 72, 76 (1st Cir. 2007) (confession made two days after the illegal search was "arguably a sufficient amount of time for [the defendant] to reflect on his predicament and determine whether he wanted to speak with an attorney before making any further statements," even though the defendant was in custody the entire time).

The second factor -- the presence of intervening circumstances -- also supports the argument that the June 19 statements were untainted. Among other

things, Lopez-Garcia's arrest on June 18 and his questioning on June 19 were conducted by different individuals -- Maldonado effected the arrest and Diaz performed the interview -- and Diaz's questioning pertained to a specific and circumscribed issue (Lopez-Garcia's immigration status) completely distinct from the subject of his arrest (suspected drug activity).

Finally, the purpose and flagrancy factors also militate against finding that the June 19 statements were tainted by the arrest. Nothing in the record suggests that the stop of Lopez-Garcia's vehicle and then his arrest, were motivated by an ulterior purpose to determine Lopez-Garcia's immigration status or to prosecute him for being in the country illegally. Nor does the record indicate any flagrant behavior by Officer Maldonado or anyone else involved in Lopez-Garcia's arrest and interrogation. There is not the slightest hint in the record that Maldonado attempted to coerce, intimidate, or trick Lopez-Garcia in any way. Maldonado spoke in Spanish so that Lopez-Garcia would understand him, and he obtained Lopez-Garcia's consent before searching him and his car. Nor is there any suggestion that Officer Diaz's inquiry on June 19 was in any way designed to coerce or trick the defendant. Thus, even if we were to assume that the underlying arrest violated Lopez-Garcia's Fourth Amendment rights, there is no basis for

16

concluding that the violation tainted the statements he made to Diaz regarding his immigration status.

Nor are we persuaded by Lopez-Garcia's argument that his statements on June 19 should be suppressed because, by failing to Mirandize him beforehand, Officer Diaz violated his Fifth Amendment rights. The Fifth Amendment provides that "[n]o person . . . shall be compelled in any criminal case to be a witness against himself . . . . " U.S. Const. amend. V. It is well established that the privilege against self-incrimination protects an individual not only from "being involuntarily called as a witness against himself in a criminal prosecution but also privileges him not to answer official questions put to him in any other proceeding, civil or criminal, formal or informal, where the answers might incriminate him in future criminal proceedings." Harrison v. Wille, 132 F.3d 679, 682 (11th Cir. 1998) (quoting Lefkowitz v. Turley, 414 U.S. 70, 77 (1973)).

In Miranda v. Arizona, 384 U.S. 436, 444 (1966), the Supreme Court held that protecting a suspect's Fifth Amendment privilege against self-incrimination requires that he be warned prior to "custodial interrogation" that he has the right to remain silent and to have an attorney present. "A defendant is in custody for the purposes of Miranda when there has been a 'formal arrest or restraint on freedom of movement of the degree associated with a formal arrest.'" United States v.

17

Brown, 441 F.3d 1330, 1347 (11th Cir. 2006) (quoting California v. Beheler, 463 U.S. 1121, 1125 (1983)).  "Interrogation," under Miranda "means 'any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect.'"  United States v. Gomez, 927 F.2d 1530, 1538 (11th Cir. 1991) (quoting Rhode Island v. Innis, 446 U.S. 291, 301 (1980)).  The Supreme Court has defined an "incriminating response" as "any response -- whether inculpatory or exculpatory -- that the prosecution may seek to introduce at trial." Innis, 446 U.S. at 302 n.5 (emphasis omitted).

Here, the parties do not dispute whether Lopez-Garcia was in custody at the time of the interview.  Instead, they join issue over whether Diaz's discussion with Lopez-Garcia amounted to an "interrogation" within the meaning of Miranda. That question boils down to whether Diaz should have known that his questions were reasonably likely to elicit an incriminating response from Lopez-Garcia. Under these circumstances, we do not believe that Diaz should have known that Lopez-Garcia was reasonably likely to make self-incriminating statements during the June 19 interview.

To begin with, Diaz had no reason to believe that Lopez-Garcia would confess to having illegally reentered the country.  Although Diaz was aware prior

18

to the interview that Lopez-Garcia had not been born in the U.S., he had no reason to believe that Lopez-Garcia had been deported, and still less reason to believe that he had reentered the country illegally. Indeed, Diaz specifically testified to this effect at the suppression hearing. On cross-examination Diaz was asked: "So when you talk with a person regarding their immigration status, you recognized that it is possible you may be discussing criminal conduct with them, right?" Diaz responded: "Yes, but I do check before that, of course; I have to make sure none of that can happen. I did my checks and nothing came up." Thus, Lopez-Garcia is simply incorrect in suggesting that Diaz's questions were likely on their face to result in self-incrimination. Based on the information available to him, Diaz should not have thought it especially likely that Lopez-Garcia would admit to having committed a crime.

Nor did Diaz have any basis for believing that Lopez-Garcia would be prosecuted for that offense. As we've noted, the underlying charge for which Lopez-Garcia had been arrested and incarcerated was not immigration-related, and Diaz's questioning of Lopez-Garcia was not initiated for law enforcement purposes. Diaz was simply tasked with facilitating the removal of individuals illegally present in the country; deciding whether to bring criminal charges was, as

19

he put it, "not his call." We conclude, therefore, that no <u>Miranda</u> warning was necessary prior to the June 19 interview.

**C.    The June 29 Confession**

Lopez-Garcia also argues that his June 29, 2007 statements must be suppressed for two reasons. Both invoke some version of the fruit of the poisonous tree doctrine, arguing that the June 29 statements were tainted by the constitutional infirmity of his June 19 statements. But even if we were to assume that Lopez-Garcia's rights had been violated by Diaz's questioning on June 19 -- and we are not persuaded on that point -- he still would fall short of showing that his June 29 statements were suppressible.

Lopez-Garcia's Fourth Amendment fruit of the poisonous tree argument is completely implausible when applied to the June 29 statements. As we have noted previously, we typically consider three factors in determining whether evidence has been tainted by a prior violation of constitutional rights: (1) the temporal proximity of the seizure and the consent; (2) the presence of intervening circumstances; and (3) the purpose and flagrancy of the official misconduct. <u>Delancy</u>, 502 F.3d at 1309. Each of these factors yields the conclusion that the June 29 statements were far too attenuated from the June 19 statements to have been tainted by them.

First, the temporal proximity between the events is exceedingly slight: a period of ten full days separates the two confessions. Moreover, the intervening circumstances here are even more pronounced than those obtaining between the June 19 confession and the arrest: while the subject of the June 19 and June 29 interviews was the same, the first interview was conducted by Diaz alone, whereas both Diaz and Agent Prieto were present for the June 29 interview. In addition, whereas the booking on June 18 and the interview on June 19 took place in the jail's intake area, Lopez-Garcia was transported to an ICE office within the jail for the June 29 questioning. Still further, Lopez-Garcia was fully Mirandized prior to the June 29 interview. Finally, nothing in the record suggests anything flagrant about the June 29 interview or anything nefarious about its purpose. On the contrary, in every respect, the interrogation was conducted according to Hoyle: Lopez-Garcia was given <u>Miranda</u> warnings prior to the interrogation; Diaz spoke to Lopez-Garcia in Spanish and took special care to ensure that he was aware of his rights and that he understood the questions he was asked. Indeed, the district court found that Lopez-Garcia appeared calm and composed throughout the interview.

Lopez-Garcia's Fifth Amendment argument fares no better when applied to the June 29 statement. Here, Lopez-Garcia claims that even though he was

Mirandized prior to the June 29 interview, his unwarned statements on June 19 invalidate his decision to waive his Miranda rights before making his June 29 confession. We are unpersuaded.

In Oregon v. Elstad, 470 U.S. 298 (1985), the Supreme Court addressed whether a properly warned confession is admissible after a defendant has first been given an unwarned or improperly warned confession. The defendant in Elstad confessed to having committed a burglary after being subjected to unwarned custodial questioning at his home. Id. at 300-01. The officers later took the defendant to their headquarters, and after giving him Miranda warnings for the first time about an hour later, he again made a full confession. Id. at 301. The Supreme Court rejected the claim that the "simple failure to administer the [Miranda] warnings, unaccompanied by any actual coercion or other circumstances calculated to undermine the suspect's ability to exercise his free will, so taints the investigatory process that a subsequent voluntary and informed waiver is ineffective for some indeterminate period." Id. at 309. Rather, the Court held that "the admissibility of any subsequent statement should turn in these circumstances solely on whether it is knowingly and voluntarily made." Id.; see also United States v. Street, 472 F.3d 1298, 1313-14 (11th Cir. 2006).

Here, like the district court, we have no doubt that Lopez-Garcia's second confession was knowingly and voluntarily made. Diaz read Lopez-Garcia his rights in Spanish and gave him the opportunity to ask any questions he might have had. Lopez-Garcia unequivocally acknowledged that he understood his rights before signing the waiver form. Neither Diaz nor Prieto was armed during the interrogation, and Lopez-Garcia appeared "calm" throughout the meeting. Nor does Lopez-Garcia suggest that Diaz's failure to Mirandize him before the June 19 interview was somehow deliberate or strategic. See Missouri v. Seibert, 542 U.S. 600, 609-11 (2004) (plurality opinion) (discussing the tactic of purposefully withholding Miranda warnings while interrogating a suspect in order to obtain a full confession and later leading the defendant to re-confess after having provided Miranda warnings). Instead, the record suggests that Diaz did not provide Miranda warnings because, given the purpose of his interview, he did not think it likely that Lopez-Garcia would make any self-incriminating statements.

Nor, finally, do we believe that Lopez-Garcia should, as he suggests, be given some leeway because of his lack of familiarity with the American criminal justice system. The current prosecution was not the first time that Lopez-Garcia found himself a defendant in a criminal case in an American court. Several years earlier, he was prosecuted by the State of Georgia on drug trafficking and gun

23

possession charges. And most importantly, he was given <u>Miranda</u> warnings prior to making his confession, and he unequivocally stated that he understood his rights before waiving them.

**D.     The Immigration File**

Finally, Lopez-Garcia argues that, in addition to his statements, the documentary evidence regarding his immigration status -- in particular, the IAQ and his alien file -- should be suppressed as well. Here, once more, Lopez-Garcia raises the specter of the fruit of the poisonous tree, arguing that this evidence would not have been obtained if it had not been for the (assertedly) unconstitutional seizure and arrest. Like his arguments for the suppression of his confessions, this argument fails in view of our conclusion that Lopez-Garcia's seizure and arrest were not unconstitutional.

This argument is also foreclosed by our recent opinion in <u>Farias-Gonzalez</u>. There, two plain-clothes ICE agents were patrolling areas of Atlanta for gang activity when they spotted Farias-Gonzalez working on his car. 556 F.3d at 1182. Based on his haircut and tattoos, the agents suspected that he might be a member of a gang. <u>Id.</u> They began to question him, and in the process, one of the agents lifted Farias-Gonzalez's shirt sleeve to see whether he had any other tattoos. <u>Id.</u> at 1182-83. Based on his answers, the agents surmised that Farias-Gonzalez was

present in the country illegally. Id. at 1183. The defendant agreed to remove his shirt so that the agents could take photographs of his tattoos. Id. Using a portable electronic fingerprint device, the agents took Farias-Gonzalez's fingerprints and determined that he had previously been deported from the United States. Id. At that point, the agents arrested him, took him to the police station, informed him of his Miranda rights, and booked him. Id.

Farias-Gonzalez was charged with illegally reentering the country after deportation in violation of 8 U.S.C. § 1326. Farias-Gonzalez, 556 F.3d at 1183. He filed a motion to suppress, contending that his Fourth Amendment rights had been violated when the agent lifted his shirt sleeve, and he sought to suppress all evidence obtained as a result of the search. Id. The district court agreed that the search was unconstitutional and, accordingly, ordered the suppression of all of the evidence except for the fingerprint evidence, the photographs of Farias-Gonzalez, and his alien file. Id. at 1184. The court based its holding on the principle that identifying information obtained as a result of an unlawful arrest is not subject to suppression. Id.

We held (without deciding whether there had been any constitutional violation) that the fingerprint evidence, photos, and alien file could not be suppressed. Id. at 1189-90. Specifically, we used the cost-benefit balancing test

25

outlined by the Supreme Court in <u>Hudson v. Michigan</u>, 547 U.S. 586 (2006), to determine whether the exclusionary rule should be applied to identity-related evidence obtained as a result of a constitutional violation. On the one hand, we reasoned that the social costs associated with suppressing identity-related information were very high. We noted, for example, that "a defendant who successfully suppressed all evidence of his identity could preclude consideration of his criminal history, which could give rise to relevant and admissible evidence at trial." <u>Farias-Gonzalez</u>, 556 F.3d at 1187. Suppression also "would prevent a judge sentencing a defendant from applying any relevant recidivism statutes and Sentencing Guidelines for those with criminal histories." <u>Id.</u> Indeed, we said that the cost of suppressing identity-related evidence was even greater in the § 1326 context, since under that statute, the defendant's presence in the country constitutes an ongoing violation. <u>Id.</u> at 1188 n.8.

On the other hand, we concluded that very little deterrence benefit would be gained by applying the exclusionary rule. We observed, for example, that identity-related information could be obtained in many ways that would not risk a Fourth Amendment violation. <u>Id.</u> at 1188-89. And we squarely held that evidence such as that in an A-File is never suppressible when it is offered only to prove a defendant's identity, regardless of whether the government had found the file as a

result of an unlawful search.  <u>Id.</u> at 1189-90.  The same holds true here: Lopez-Garcia's claim that his A-File should have been suppressed is untenable.

**III.**

Lopez-Garcia also contends that the district court erred in imposing a sixteen offense-level enhancement on his sentence based on his prior conviction for a felony firearms offense under Georgia law.  We disagree.

In applying the enhancement, the district court relied on United States Sentencing Guideline § 2L1.2, which provides for a sixteen offense-level increase if "the defendant previously was deported, or unlawfully remained in the United States, after . . . a firearms offense."  U.S.S.G. § 2L1.2(b)(1)(A)(iii).  In 2002, Lopez-Garcia pleaded guilty under Georgia state law to possessing a firearm during the commission of a crime.  Ga. Code Ann. § 16-11-106(b).  The district court concluded that Lopez-Garcia's conviction under section 16-11-106(b)(4) constituted a "firearms offense" within the meaning of U.S.S.G. § 2L1.2(b)(1)(A)(iii).  Accordingly, the district court concluded that the enhancement was warranted in light of Lopez-Garcia's conviction for illegally reentering the United States after deportation.

Lopez-Garcia says that his prior firearms offense under Georgia law does not qualify as a "firearms offense" within the meaning of U.S.S.G. § 2L1.2.  The

definition of "firearms offense" is provided in application note 1(B)(v) to Guideline 2L1.2.[1] In relevant part, the note explains that a "firearms offense" means "[a]n offense under state or local law consisting of conduct that would have been an offense under subdivision (III), (IV), or (V) if the offense had occurred within the special maritime and territorial jurisdiction of the United States." U.S. Sentencing Guidelines Manual § 2L1.2 cmt. n.1(B)(v)(2007). Of the offenses

---

[1] Application Note 1 (B)(v) provides that "firearms offense" means any of the following:

(I) An offense under federal, state, or local law that prohibits the importation, distribution, transportation, or trafficking of a firearm described in 18 U.S.C. 921, or of an explosive material as defined in 18 U.S.C. 841(c).

(II) An offense under Federal, state, or local law that prohibits the possession of a firearm described in 26 U.S.C. 5845(a), or of an explosive material as defined in 18 U.S.C. 841(c).

(III) A violation of 18 U.S.C. 844(h).

(IV) A violation of 18 U.S.C. 924(c).

(V) A violation of 18 U.S.C. 929(a).

(VI) An offense under state or local law consisting of conduct that would have been an offense under subdivision (III), (IV), or (V) if the offense had occurred within the special maritime and territorial jurisdiction of the United States.

U.S. Sentencing Guidelines Manual § 2L1.2 cmt. n.1(B)(v)(2007).

found in subsections (III), (IV), and (V), only the one listed in subsection (IV) --

18 U.S.C. § 924(c) -- is a plausible federal analogue for Lopez-Garcia's state law

offense. Under § 924(c), it is illegal for a defendant, during and in relation to a

drug-trafficking offense, to use, carry, or possess a firearm in furtherance of that

crime. See, e.g., United States v. Woodard, 531 F.3d 1352, 1362 (11th Cir.

2008). Thus, the question whether the district court erred in enhancing Lopez-

Garcia's offense level under U.S.S.G. § 2L1.2 depends on whether his prior state

firearms conviction (if it had occurred within federal jurisdiction) would have

constituted an offense under § 924(c). We believe it would have.

Lopez-Garcia says that his conduct in violating section 16-11-106(b) of the

Georgia Code would not have constituted an offense under § 924(c) because the

elements of the two offenses are different. In particular, he notes that section 16-

11-106(b)(4) punishes "[a]ny person who shall have on or within arm's reach of

his or her person a firearm . . . during the commission of, or the attempt to commit

. . . [a]ny crime involving the possession, manufacture, delivery, distribution,

dispensing, administering, selling, or possession with intent to distribute any

controlled substance." Ga. Code Ann. § 16-11-106(b)(4). On the other hand, he

points out, § 924(c)(1)(A) applies to "any person who, during and in relation to

any crime of violence or drug trafficking crime . . . uses or carries a firearm, or

29

who, in furtherance of any such crime, possesses a firearm." 18 U.S.C. § 924(c)(1)(A). In other words, according to Lopez-Garcia, a defendant who is in possession of a controlled substance with intent to distribute, may be convicted under the Georgia statute merely for having a firearm within his reach, whereas under § 924(c), this is not enough.

Unfortunately, Lopez-Garcia never clearly explains what more he believes is required under § 924(c). He notes that under the Supreme Court's decision in Bailey v. United States, 516 U.S. 137 (1995), "use" of a firearm under § 924(c) requires "active employment of the weapon as by brandishing or displaying it in some fashion." Lopez-Garcia Br. at 37. However, § 924(c) does not require the government to show that Lopez-Garcia used the firearm; rather, the statute also makes it illegal to "carry" or "possess" a firearm, and a conviction under 924(c)'s "carrying" and "possessing" prongs does not require a showing of "active employment." Indeed, Congress amended § 924(c) to include the alternative "carrying" and "possessing" requirements in response to what it considered the Supreme Court's overly stringent interpretation of "use" in Bailey.[2] See Pattern

---

[2] As the commentary to the Eleventh Circuit's pattern jury instruction explains:

> In 1998, in direct response to Bailey, Congress amended the statute in several respects including the insertion of the phrase "or who, in furtherance of any such crime, possesses

30

Crim. Jury Instr. 11th Cir. OI 35.2, cmt. at 243 (2003). Hence, Lopez-Garcia is simply incorrect in suggesting that § 924(c) requires "active employment" of his firearm whereas section 16-11-106(b)(4) does not.

Lopez-Garcia further argues that under § 924(c), the offense of "carrying" a firearm cannot be established merely by a showing that the defendant had possession of a firearm; rather, he claims, the government must show that the firearm has been "transported." Again, while this is true, <u>see, e.g.</u>, <u>United States v. Leonard</u>, 138 F.3d 906, 910 (11th Cir. 1998) ("As interpreted both by us and by our sister circuits, the 'carry' prong of § 924(c)(1) requires more than proof of mere possession; the government must prove that the defendant actually transported the firearm as well."), it is also irrelevant, since the transportation requirement applies to the "carrying" prong of § 924(c), not to the statute's "possession" prong. <u>Id.</u>

---

a firearm . . . ." The stated purpose and effect of this amendment was to overcome the <u>Bailey</u> court's constrictive interpretation of the scope of the statute and to extend its reach to any drug trafficking or violent crime in which the Defendant merely possesses a firearm "in furtherance of any such crime."

<u>See</u> Pattern Crim. Jury Instr. 11th Cir. OI 35.2, cmt. at 243 (2003) (citations omitted).

To be sure, § 924(c)'s "possession" prong requires a showing that the defendant's possession of the firearm "helped, furthered, promoted, or advanced the drug trafficking." United States v. Timmons, 283 F.3d 1246, 1252 (11th Cir. 2002). But the conduct underlying Lopez-Garcia's state law firearms conviction easily meets this requirement. In Timmons, we explained that in order to meet the "in furtherance of" requirement, there "must be a showing of some nexus between the firearm and the drug selling operation," which

> can be established by the type of drug activity that is being conducted, accessibility of the firearm, the type of the weapon, whether the weapon is stolen, the status of the possession (legitimate or illegal), whether the gun is loaded, proximity to the drugs or drug profits, and the time and circumstances under which the gun is found.

Id. at 1253 (internal citations and quotation marks omitted).

As explained in Lopez-Garcia's PSI, his conviction under section 16-11-106(b)(4) was based on the fact that when he was apprehended for the drug offense, he was found under the covers of a bed, along with the gun, a quantity of methamphetamine, and several hundred dollars in cash. The nexus between the gun and the drug trafficking here is plainly established by, for example, the accessibility of the firearm to Lopez-Garcia, and the proximity of the gun to the drugs and the drug profits.

32

Lopez-Garcia also says that, under the Supreme Court's recent decision in United States v. Shepard, 544 U.S. 13 (2005), the district court is limited with respect to the sources it is permitted to consult in determining the conduct on which his state law firearms conviction was based. Specifically, he claims that the court is permitted to consider only "the terms of the charging document, the terms of a plea agreement or transcript of colloquy between judge and defendant in which the defendant confirmed the factual basis for the plea, or to some comparable judicial record of this information," and that the court may not consider "extrajudicial records such as police reports or complaint applications." Lopez-Garcia Br. at 38. The reasoning here is elusive, however, because the district court's account of the facts surrounding Lopez-Garcia's state law firearms conviction was derived from Lopez-Garcia's PSI, not from any of the sources forbidden under Shepard.

We have yet to specifically address whether reliance on a PSI is permissible under Shepard, but it is not necessary that we do so today because Lopez-Garcia does not contend that the district court's reliance on the PSI was erroneous; nor does he dispute in any significant way the facts set forth in the PSI.[3] As we have

---

[3] It is true that in the district court, Lopez-Garcia objected to paragraph 22 of the PSI, which is the part of the report describing the facts surrounding Lopez-Garcia's section 16-11-106(b)(4) conviction. But Lopez-Garcia's objection was a

previously held, "[a] sentencing court's findings of fact may be based on undisputed statements in the PSI." United States v. Bennett, 472 F.3d 825, 832 (11th Cir. 2006) (citing United States v. Wilson, 884 F.2d 1355, 1356 (11th Cir. 1989)). "It is the law of this circuit that a failure to object to allegations of fact in a PSI admits those facts for sentencing purposes. It is also established law that the failure to object to a district court's factual findings precludes the argument that there was error in them." United States v. Wade, 458 F.3d 1273, 1277 (11th Cir. 2006) (internal citations omitted). Where statements in a PSI are undisputed, "the court [is] permitted to rely on them despite the absence of supporting evidence." United States v. Hedges, 175 F.3d 1312, 1315 (11th Cir. 1999).

We review the district court's findings of fact for clear error and its application of the Sentencing Guidelines de novo. United States v. Rendon, 354 F.3d 1320, 1329 (11th Cir. 2003). None of the district court's findings of fact was erroneous, much less clearly erroneous; and based on the facts set forth in the PSI,

---

narrow one, asserting only that the document he possessed did not reveal the exact number of guns or the exact amount of currency that he was found to have been in possession of. These details are unimportant for the purposes of determining whether the conduct underlying Lopez-Garcia's state law conviction would have satisfied § 924(c). All that is necessary to meet § 924(c)'s nexus requirement are the more general facts that Lopez-Garcia was found with a gun, drugs, and money, and that these were in close proximity with one another. Lopez-Garcia does not dispute those facts.

the district court correctly concluded that the conduct on which Lopez-Garcia's state law firearms conviction was based would have constituted a violation of § 924(c). Lopez-Garcia's prior conviction meets the definition of "firearms offense" under Guideline § 2L1.2, and the district court did not err in imposing the Guideline's sixteen offense-level enhancement.

## IV.

In sum, the district court was correct in denying Lopez-Garcia's motion to suppress Lopez-Garcia's statements to Agent Diaz. While we believe that the initial stop of Lopez-Garcia's car and the ensuing arrest did not violate his Fourth Amendment rights, the district court was nonetheless correct in holding that none of Lopez-Garcia's subsequent statements to Agent Diaz were tainted under the fruit of the poisonous tree doctrine. Similarly, the documentary evidence regarding Lopez-Garcia's immigration status -- the IAQ and his A-File -- were not suppressible. Finally, the district court did not err in enhancing Lopez-Garcia's sentence based on his prior state court conviction for a firearms offense.

**AFFIRMED.**