# TEXAS COURT OF APPEALS, THIRD DISTRICT, AT AUSTIN

---

### NO. 03-21-00530-CR

---

**The State of Texas, Appellant**

**v.**

**Devon Lovegrove, Appellee**

---

### FROM THE 331ST DISTRICT COURT OF TRAVIS COUNTY
### NO. D-1-DC-21-300936, HONORABLE CHANTAL ELDRIDGE, JUDGE PRESIDING

---

## M E M O R A N D U M   O P I N I O N

The State of Texas filed this interlocutory appeal from the district court's order granting Devon Lovegrove's pretrial motion to suppress evidence of statements that he made to police. *See* Tex. Code Crim. Proc. art. 44.01(a)(5). On appeal, the State contends that the district court erred by concluding that: (1) Lovegrove's statements to police after invoking his rights were not made voluntarily and (2) police unlawfully reinitiated Lovegrove's interrogation. We will affirm the district court's order granting the motion to suppress.

## BACKGROUND

Lovegrove flagged down a police officer who was driving to the controlled-access gate of the police-station garage. The police officer got out of his patrol car, and Lovegrove walked to him, stating that he "got mixed up in some trouble," wanted to go back home to

Georgia, and wanted to check whether he was in "lawful trouble."[1] When the police officer asked what happened, Lovegrove replied, "I helped someone escape from their home, and I panicked because a person in charge of them had found out, and then told me that they were a different age than they said they were. So I freaked out, and I bolted." Lovegrove confirmed that these events involved "J.S.," an underage girl. Another police officer walked out to the gate, minutes after Lovegrove flagged down the first officer.

Lovegrove's additional statements to police in the ensuing investigation led to his arrest for human trafficking. *See* Tex. Penal Code § 20A.02(a)(7). Lovegrove later moved to suppress statements that he made to police after receiving *Miranda* warnings and invoking his right to remain silent and his right to counsel. *See Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966) (requiring that before custodial interrogation, law-enforcement officers must advise accused of certain constitutionally protected rights to secure accused's Fifth Amendment privilege against self-incrimination). Lovegrove's motion to suppress argued that the police: (1) conducted a custodial interrogation of him when he invoked his *Miranda* rights; (2) did not "scrupulously honor" his right to remain silent; (3) violated his right to counsel by reinitiating conversation with him after he asserted his right to counsel; and (4) intentionally employed a prohibited two-step interrogation tactic—"question first, warn later"—in violation of *Missouri v. Seibert*, 542 U.S. 600 (2004) (prohibiting officers from using two-step, "question first, warn later" interrogation technique to circumvent suspect's *Miranda* protections).

Neither party presented any witness testimony during the September 20, 2021 hearing on Lovegrove's motion to suppress. Lovegrove offered as exhibits videos from the body cameras worn by Austin Police Officers Gustave Gallenkamp (Exhibit DX1) and Phillip Zolli

---

[1] The officer understood this as a request for a warrants check.

(Exhibit DX2) on the date of Lovegrove's arrest.[2]  The parties stipulated to the authenticity of the videos from those cameras, which were admitted without redaction.  Lovegrove argued that after he had received his *Miranda* warnings and invoked his right to remain silent and his right to counsel, police improperly reinitiated their interrogation of him.  The State agreed that some of Lovegrove's statements to police should be suppressed and redacted them from the video evidence.

However, the State contended that Lovegrove's statements on two other portions of the videos were admissible: (1) Lovegrove's statements made after he was handcuffed and received *Miranda* warnings the first time but before he invoked his right to remain silent and (2) Lovegrove's statements made after he was informed that his charge had been changed from harboring a runaway to human trafficking and received *Miranda* warnings a third time.[3]  After the hearing, the district court granted the motion to suppress, ultimately prohibiting the State "from introducing statements made by Lovegrove after he was placed in handcuffs."  The suppression of these portions of the videos are the focus of this appeal.

**Lovegrove Approaches Police**

The video evidence admitted during the suppression hearing shows that before police provided *Miranda* warnings to Lovegrove, he voluntarily discussed his situation with them for approximately twenty-four minutes.  The unusual circumstances of Lovegrove's

---

[2]  Lovegrove acknowledges that the footage from the officers' bodycam videos is essentially duplicative.  As the trial court's Order Granting Defendant's Motion to Suppress refers almost exclusively to Exhibit DX1, we will follow suit except where information is better displayed on Exhibit DX2.

[3]  The State also identified by timestamps the portions of Exhibit DX1 that it contended were admissible and should not be suppressed: statements from 28:41 to 31:14 and statements made after 1:33:26.

3

encounter with police led them to inquire whether he had any mental illness or medical condition or took any medications, all of which Lovegrove denied. He reported that he drove from his home in Georgia to Tennessee about ten days earlier to pick up two girls, J.S. and another girl known only as "E" whom he had met on Omegle, "a web site where you can talk to strangers."

According to Lovegrove, E "was looking for other people who might be looking to run away, too," and found J.S. After Lovegrove picked up the girls and took them to Georgia, he "was contacted by [J.S.'s] aunt," and he knew that "logically what [he] should've done was just taken her back to her aunt," but he said that J.S. told him that she was suicidal. At some point, E went her own way, Lovegrove left his car in Georgia, and he and J.S. hitchhiked and rode with someone who drove them 500 miles to Houston. He and J.S. eventually arrived in Austin. Lovegrove and J.S. had gotten into an argument, and he thought she had been picked up by police in Austin because he saw her talking to them the night before within walking distance of Austin police headquarters. He claimed that J.S. said that she would talk to her aunt and that he should wait until morning to talk to the police so that he would not get in trouble.

Meanwhile, the officers were running warrants checks in Texas, Georgia, and Tennessee and searching for information on J.S. based on Lovegrove's physical description of her. The trial court found that, while Officer Zolli questioned Lovegrove, Officer Gallenkamp read a police report that J.S. reported that an individual named "Alex" had involuntarily transported her to Texas, placed a dog collar on her, and choked her. Lovegrove denied having any identification or a phone on him. Officer Gallenkamp asked Lovegrove if he went by "Alex" on social media, which Lovegrove confirmed. While they were still standing outside the

4

gate to the police-headquarters garage where Lovegrove first flagged down Officer Gallenkamp, the officers handcuffed him and stated that they were detaining him.[4]

After handcuffing Lovegrove, Officer Gallenkamp said that he was going to question him and asked him to tell the truth. Because Lovegrove was detained but had not yet received *Miranda* warnings, the State agrees that his statements in response to police questioning should be redacted from the evidence presented to the factfinder from time he was handcuffed until he first received *Miranda* warnings.[5]

**Disputed Admissibility of Statements After Handcuffing and *Miranda* Warnings**

After Lovegrove was handcuffed and Officer Gallenkamp had been questioning him for about two minutes, Officer Zolli pulled a notebook from his pocket with a small blue card containing the *Miranda* warnings. Officer Zolli held the card in his hand at his side for two more minutes—while Officer Gallenkamp continued questioning Lovegrove—before reading the *Miranda* warnings to Lovegrove for the first time.[6] Lovegrove answered, "Yes, sir," each time he was asked whether he understood the specific right that had been read to him. Lovegrove said that he and J.S. had been staying on the street while in Austin.

---

[4] Lovegrove's statements to police before he was handcuffed were not suppressed by the district court's order, which applies only to "statements made by Lovegrove after he was placed in handcuffs." He was placed in handcuffs and told he was detained on Exhibit DX1 beginning at timestamp 24:30.

[5] The State agrees that Lovegrove's statements made when he was handcuffed and detained but had not yet received Miranda warnings are inadmissible and should be redacted from the video. These statements are on Exhibit DX1 from timestamp 24:20 through 28:41.

[6] Exhibit DX1 shows Officer Zolli pulling the *Miranda* card from a notebook at timestamp 26:30 and then reading the *Miranda* warnings to Lovegrove for the first time at 28:41.

Officer Zolli and Lovegrove then walked to an area just inside the police-station garage gate, and Officer Gallenkamp moved his patrol car so that it was no longer blocking the entry-gate sensor and other vehicles would not have to wait for him to wave them through.

After Officer Gallenkamp parked the car, Officer Zolli asked Lovegrove if there was a reason he came to Texas; Lovegrove responded that "the original goal was to go to California." Officer Gallenkamp resumed his questioning, during which Lovegrove admitted that he came to Texas from Georgia because he knew that he had a thirteen-year-old girl with him that he should not have, and he was trying to get away; stated that he was not sure where his vehicle was and that he had left it at a rest stop in Georgia or Alabama; and admitted that J.S. wanted to leave.

Officer Gallenkamp then asked Lovegrove, "You didn't let [J.S.] leave, right?" and Lovegrove said, "I'd like to remain silent." Officer Gallenkamp confirmed, "Okay. Are you not wanting to answer any more questions?" and Lovegrove said, "I would like—I would prefer to have a lawyer present."[7] Questioning ceased. Officer Gallenkamp told Lovegrove that he was not free to go and that a detective would be contacted. Officer Gallenkamp then walked to his patrol car, where he called for a detective. Lovegrove sat down while the officers conferred at a distance by the patrol car.

**Lovegrove Asks About Charges Against Him**

Officer Gallenkamp told Officer Zolli about another police officer's report stating that J.S. had escaped from Lovegrove, who did not want her to leave and tried to choke her when

---

[7] Lovegrove's invocation of these rights is in Exhibit DX1 at timestamps 31:11 (silence) and 31:17 (attorney present).

she did.  Officer Gallenkamp also related that there was an "endangered missing child" report in Tennessee listing Lovegrove as the person who was with J.S. and describing his vehicle.

Officer Zolli walked over to Lovegrove and advised him that they were waiting on a call from a detective.  Officer Gallenkamp also walked over and told Lovegrove that because he "invoked [his] right," they would not be asking him any questions, but if Lovegrove changed his mind and wanted to talk to them or allow further questioning from them, they would have to reread the little blue card to him (containing the *Miranda* warnings).  Lovegrove nodded and stated, "Yes sir."

No communication occurred between the officers and Lovegrove until he stated, "I do have a question."[8]  Officer Gallenkamp replied, "We gotta read you the *Miranda* card." Officer Gallenkamp then received a call from the detective and stepped away to speak with him. Officer Zolli stayed with Lovegrove and provided *Miranda* warnings to him but did not ask him any questions.  After receiving the warnings, Lovegrove asked when he would be able to see the charges against him.  Officer Zolli stated that there were no charges against him "right now." Lovegrove then asked why he was being detained.  Officer Zolli said, "So we can conduct our investigation."  Lovegrove replied, "Okay, fair enough."  Officer Zolli explained that the officers had to "do [their] due diligence" given the information that Lovegrove provided to them. Lovegrove then reinvoked his right to remain silent. [9]

---

[8]  Lovegrove told police that he has a question in Exhibit DX1 at timestamp 39:11; that event occurs in Exhibit DX2 at timestamp 37:22.

[9]  The trial court found that Lovegrove reinvoked his right to remain silent in Exhibit DX2 at 39:14.  That is the only citation to Exhibit DX2 in the trial court's Order Granting Defendant's Motion to Suppress.  Exhibit DX1 does not contain this reinvocation because Officer Gallenkamp was on a telephone call away from Lovegrove at that moment.

**Lovegrove's Inadmissible Statements During Search Incident to Arrest**

The officers conferred with the detective, a sergeant, and another police officer about the possible charges against Lovegrove. There was also discussion that the detective was en route to speak with J.S. at a child advocacy center. When Officer Gallenkamp walked back to Lovegrove, he told him, "So, you're under arrest, okay? For harboring a runaway, okay? Do you need me to explain what that means, or—." Lovegrove replied, "If you don't mind." Officer Gallenkamp summarized the charged offense while putting on gloves and asked Lovegrove whether he had any guns or knives on him before conducting a search incident to arrest.

When the officer found a wallet in the pocket of Lovegrove's pants, Lovegrove began describing the wallet's contents, which did not include any identification. Officer Gallenkamp said, "I gotta ask man, and you don't have to answer if you don't want to, but it is not normal to not have your ID or anything, like why'd you [unintelligible] all that?" Because these statements occurred after Lovegrove invoked his rights to remain silent and to counsel, the State initially agreed that his statements responding to police during the search incident to arrest should be redacted from the video.[10]

---

[10] On appeal, the State retracts its agreement and disputes whether Lovegrove clearly invoked his right to counsel. However, in an appeal from a ruling on a motion to suppress, the State may not rely on a theory that it failed to present to the trial court. *See State v. Steelman*, 93 S.W.3d 102, 106-07 (Tex. Crim. App. 2002). Because the State failed to complain below that Lovegrove inadequately invoked his right to counsel, that complaint is not preserved for our review, and we need not reach it. *See* Tex. R. App. P. 33.1(a); *Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002) ("This 'raise it or waive it' forfeiture rule applies equally to goose and gander, State and defendant.").

The statements during the search incident to arrest that the State told the district court were inadmissible and should be redacted from the video are those on Exhibit DX1 from timestamp 1:19:30 through 1:22:47.

**Disputed Admissibility of Statements After Charges Were Changed**

After completing the search incident to arrest, Officer Gallenkamp walked Lovegrove to the patrol car and seated him inside. As they were leaving the garage, Officer Gallenkamp received a phone call from the detective and got out of the patrol car to take it. During the call, Officer Gallenkamp learned about the existence of a video and stated, "That's what he confirmed, he watched them from a distance." There was also discussion during the call about changing the charge against Lovegrove to "trafficking of persons."

Officer Gallenkamp returned to the patrol car and informed Lovegrove that the charges were changed. When Lovegrove asked about the charges, Officer Gallenkamp gave his paraphrased summary of the offense. Although Lovegrove said he "understood," Officer Gallenkamp asked if Lovegrove had any comment:

> Officer Gallenkamp: I just got off the phone with the detective—can you hear me—I'll roll up the window so you can hear me better. The charge has been changed from harboring a runaway to trafficking of persons, okay?
>
> Lovegrove: Wait, what does 'trafficking' mean?
>
> Officer Gallenkamp: [Summarized the offense.]
>
> Lovegrove: Understood.
>
> Officer Gallenkamp: Anything you wanna comment or are you just gonna—
>
> Lovegrove: I didn't traffic her, that's—I mean, I know you're all 'yes' or 'no,' but I'm not sure if you need to read me my rights.
>
> Officer Gallenkamp: All right, if I read you the rights are you gonna answer some questions, or no? 'Cause I can only read you the rights if you're willing to ask me questions [sic], or answer questions, okay?
>
> Lovegrove: Yeah, I'll answer the questions—

Officer Gallenkamp: Hold on, hold on, hold on. I mean you'll—so you want me to read you the rights, right? So, if I get out of the car, I'm going to read you the *Miranda* rights one more—another time and you're willing to answer some questions?

Lovegrove: No, I was just gonna finish what I was saying before I asked if you'd like, 'cause you asked me about the—

Officer Gallenkamp: All right, hold on. Let me just—just for—let me just read it to you, okay? [11]

Officer Zolli brought the *Miranda* warnings card, and Officer Gallenkamp provided the *Miranda* warnings to Lovegrove for the third time.[12] Afterward, Officer Gallenkamp asked whether Lovegrove had sex with J.S. anytime during the ten-to-twelve days when they went from Georgia to Tennessee, back to Georgia, and then to Austin. Lovegrove stated, "I'd like to not respond." Officer Gallenkamp confirmed, "Okay, so you said you just don't wanna respond to that question." Lovegrove verbally agreed and nodded.

Officer Gallenkamp then asked, "Do you have any questions about what you're being charged with?" Lovegrove responded, "I was wondering if I could make a statement?" Officer Gallenkamp replied, "Yeah, go ahead." Lovegrove proceeded to give a statement incriminating himself as to the human-trafficking charge, recounting events from the time that he met J.S. and E to the time that they arrived in Texas and answering Officer Gallenkamp's

---

[11] This quoted exchange is on Exhibit DX1 from timestamp 1:30:10 to 1:31:46.
[12] Officer Gallenkamp finished reading the *Miranda* warnings to Lovegrove and asked Lovegrove whether he understood, and Lovegrove responded, "Yes, sir" on Exhibit DX1 at timestamp 1:33:53.

questions for the next forty-two minutes. The State contends that this set of statements is admissible because Lovegrove reinitiated the conversation by asking about making a statement.[13]

**District Court's Ruling**

At the conclusion of the suppression hearing, the district court granted Lovegrove's motion, explaining that "the totality of the circumstances, starting with the voluntary encounter with the police all the way through the third *Miranda* rights, . . . indicates that his statements were not voluntarily made." The State requested findings of fact and conclusions of law from the district court and filed a notice of appeal. On October 18, 2021, the district court signed a written order memorializing its oral ruling granting the motion to suppress.

The order contained the district court's findings and conclusions.[14] It referenced the parties' dispute about the admissibility of two sets of statements: (1) those Lovegrove made after he was initially read his *Miranda* rights and before he invoked those rights and (2) those Lovegrove made after Officer Gallenkamp explained the human trafficking charge and asked Lovegrove, "Anything you want to comment on or are you just gonna—?" As to the first set, the district court concluded that the State offered no evidence or argument regarding either officer's intent in delaying the *Miranda* warnings; that midstream *Miranda* warnings were not effective to establish a knowing, intelligent, and voluntary waiver of Lovegrove's rights; and that Lovegrove's statements were inadmissible under *Missouri v. Seibert*, 542 U.S. 600 (2004). As to

---

[13] The portions of the video that the State contended were admissible and should not be suppressed were the statements after the third set of *Miranda* warnings. This is on Exhibit DX1 from approximately timestamp 1:35:24 (after Lovegrove asked if he could make a statement) through 2:17:37 (when Lovegrove denied having anything else he wanted to add to his statements).

[14] The State filed objections to the district court's findings and conclusions, and Lovegrove filed a reply to those objections, but the record contains no ruling on them.

the second set of statements, the district court concluded that the officers failed to respect Lovegrove's invocation of his rights by questioning him during the search and that initial violation was never remedied, rendering any of Lovegrove's subsequent statements inadmissible under *Michigan v. Mosley*, 423 U.S. 96 (1975) and *Edwards v. Arizona*, 451 U.S. 477 (1981).

Additionally, the district court concluded that the officers unlawfully reinitiated interrogation of Lovegrove when Officer Gallenkamp explained the charge and asked, "Anything you want to comment on or are you just gonna—?" Independent of *Mosley* and *Edwards*, the district court also concluded that the second set of statements were inadmissible under *Seibert* because throughout their interaction with Lovegrove, the officers intentionally elicited numerous incriminating statements in violation of *Miranda*. Finally, the district court concluded that Lovegrove's purported waiver of his *Miranda* rights was not made intentionally, knowingly, and voluntarily.

In sum, the district court's order prohibited the State "from introducing statements made by Lovegrove after he was placed in handcuffs."

## DISCUSSION

### Standard of Review

Before turning to the State's issues, we address the parties' dispute as to the applicable standard of review. We review a trial court's ruling on a motion to suppress evidence under a bifurcated standard, *Martin v. State*, 620 S.W.3d 749, 759 (Tex. Crim. App. 2021), giving almost total deference to the trial court's findings of fact and reviewing de novo the application of the law to the facts, *State v. Ruiz*, 577 S.W.3d 543, 545 (Tex. Crim. App. 2019). That same deferential standard applies to the trial court's determination of historical facts, even

12

if that determination is based on a video recording admitted into evidence at a suppression hearing. *State v. Duran*, 396 S.W.3d 563, 570 (Tex. Crim. App. 2013); *see State v. Garcia*, 569 S.W.3d 142, 149 (Tex. Crim. App. 2018) (noting that on matters of historical fact, trial judge is in better position than appellate court to settle disputes). Thus, an appellate court may review de novo "indisputable visual evidence" contained in a videotape but must defer to the trial judge's factual finding on whether a witness actually saw what was depicted on a videotape or heard what was said during a recorded conversation. *Duran*, 396 S.W.3d at 570-71; *see Montanez v. State*, 195 S.W.3d 101, 109 (Tex. Crim. App. 2006) (quoting *Anderson v. Bessemer City*, 470 U.S. 564, 573-74 (1985) and noting that parties to appeal have already focused on persuading trial judge that "their account of the facts is the correct one," which they need not do again at appellate level).

Here, the facts surrounding Lovegrove's questioning were captured on video and the parties stipulated to the authenticity of that video, which the district court admitted into evidence without redaction. The parties did not dispute whose account of the facts was correct, no witnesses testified at the suppression hearing, and no trial-court findings were made as to credibility and demeanor. Consequently, there were no fact findings on "whether a witness actually saw what was depicted on a videotape or heard what was said during a recorded conversation." *Cf. Duran*, 396 S.W.3d at 570-71.

In cases like this, where no witness testimony is presented at the suppression hearing, the custodial questioning was videotaped, and the underlying events are not in dispute, the trial court's ruling is merely an application of the law to uncontested facts. *See Mayes v. State*, 8 S.W.3d 354, 358 (Tex. App.—Amarillo 1999, no pet.). The Court of Criminal Appeals has concluded that a court of appeals errs by applying a deferential standard to a trial

court's ruling on a motion to suppress when that ruling was not based on any witness testimony or finding of historical fact and did not turn on an evaluation of credibility and demeanor. *See State v. Stevens*, 235 S.W.3d 736, 740 (Tex. Crim. App. 2007); *see also Carmouche v. State*, 10 S.W.3d 323, 332 (Tex. Crim. App. 2000) (noting that nature of evidence presented in videotape did not pivot on evaluation of credibility and demeanor). Rather, we review de novo a trial court's ruling on a motion to suppress when the application of law to facts does not involve determinations of credibility and demeanor. *See Stevens*, 235 S.W.3d at 740; *Maestas v. State*, 987 S.W.2d 59, 60 (Tex. Crim. App. 1999) ("Because the facts of this case do not involve an evaluation of credibility of any witness by the trial judge, we will conduct our own de novo review."); *Mayes*, 8 S.W.3d at 358 ("We review de novo a trial court's ruling on a motion to suppress if that ruling merely involved an application of law to undisputed fact."); *see also State v. Kerwick*, 393 S.W.3d 270, 273 (Tex. Crim. App. 2013) ("[W]hen mixed questions of law and fact do not depend on the evaluation of credibility and demeanor, the appellate court reviews the trial judge's ruling de novo."); *Garcia v. State*, 15 S.W.3d 533, 535 (Tex. Crim. App. 2000) (concluding that in appeal of ruling on motion to suppress "[t]he determination of whether a statement is voluntary is a mixed question of law and fact, i.e., an application of law to a fact question"). Accordingly, we review de novo the district court's ruling on the motion to suppress.

**Voluntariness of Statements After *Miranda* Warnings and Lovegrove's *Seibert* Complaint**

On appeal, the State contends that Lovegrove's statements to police after the *Miranda* warnings were first provided to him and before he invoked those rights were voluntary statements and are admissible. Lovegrove counters that those statements are inadmissible because the officers intentionally used a "question first, warn later" technique in violation of

14

*Seibert*. *See* 542 U.S. at 613 (noting that "if the interrogators employ the technique of withholding warnings until after interrogation succeeds in eliciting a confession, the warnings will be ineffective in preparing the suspect for successive interrogation, close in time and similar in content").

The Fifth Amendment prohibits the government from compelling a criminal suspect to bear witness against himself. U.S. Const. amend. V; *Pecina v. State*, 361 S.W.3d 68, 74-75 (Tex. Crim. App. 2012). In *Miranda*, the Supreme Court established safeguards to protect the privilege against self-incrimination in the inherently coercive atmosphere of custodial interrogations. *Pecina*, 361 S.W.3d at 75. Consistent with those safeguards, police officers must give *Miranda* warnings to one who is in custody before questioning him. *Id.* The warnings advise "that he has a right to remain silent, that any statement he does make may be used as evidence against him, and that he has a right to the presence of an attorney, either retained or appointed." *Miranda*, 384 U.S. at 444. "The defendant may waive effectuation of these rights, provided the waiver is made voluntarily, knowingly and intelligently." *Id.* Only if the person voluntarily and intelligently waives his *Miranda* rights may his statement be introduced into evidence against him at trial. *Pecina*, 361 S.W.3d at 75.

The implications of *Miranda* regarding a suspect's post-warning statements were addressed in *Seibert*. *See* 542 U.S. at 604-05. In that case, police officers deliberately failed to provide *Miranda* warnings to a suspect before questioning, conducted their interrogation and obtained incriminating statements, provided "midstream" *Miranda* warnings to the suspect after the initial interrogation, and then obtained another statement from the suspect. *See id*. This type of "question first, warn later" strategy "is based on the assumption that *Miranda* warnings will tend to mean less when recited mid-interrogation, after inculpatory statements have already been

15

obtained." *Id.* at 620 (Kennedy, J., concurring). The Supreme Court held that the suspect's post-warning statements in *Seibert* were inadmissible because: (1) the question-first tactic threatened to thwart *Miranda*'s purpose of reducing the risk of a coerced confession, and (2) there was no showing that midstream *Miranda* warnings given to the suspect could have served their purpose. *See id.* at 617.

When an initial *Miranda* violation is inadvertent rather than deliberate, a second statement made after the required warnings is admissible if the post-warning statement was given voluntarily. *See id.* at 620 (Kennedy, J., concurring) (citing *Oregon v. Elstad*, 470 U.S. 298, 309 (1985)); *see also Carter v. State*, 309 S.W.3d 31, 38 (Tex. Crim. App. 2010) (adopting J. Kennedy's concurring opinion in *Seibert*). We consider whether there was a *Seibert* violation before determining whether post-warning statements to police were made voluntarily. *See Carter*, 309 S.W.3d at 41 ("Once a determination has been made that the pre-warning questioning was not part of a deliberate plan to undermine a suspect's *Miranda* protections, it is still necessary to determine if [defendant]'s post-warning statements were voluntarily made."); *Foster v. State*, 579 S.W.3d 606, 612 (Tex. App.—Houston [14th Dist.] 2019, no pet.) (noting that when defendant receives midstream *Miranda* warnings and moves to suppress his post-*Miranda* statements, threshold determination is whether two-step, "question first, warn later" strategy was deliberately employed, and if it was not, next determination is whether defendant waived his *Miranda* rights voluntarily).

The pivotal question in determining the admissibility of post-*Miranda* statements is whether the evidence shows that the officers deliberately employed a two-step, "question first, warn later" interrogation technique to circumvent the suspect's *Miranda* protections. *See Carter*, 309 S.W.3d at 38. Whether the "question first, warn later" strategy was deliberate hinges on the

interrogating officer's subjective intent. *See id.* at 39; *Foster*, 579 S.W.3d at 612. The State has the "burden of disproving the deliberate employment of a two-step interrogation technique once a defendant objects to the admission of his statement on two-step interrogation grounds." *Vasquez v. State*, 483 S.W.3d 550, 554 (Tex. Crim. App. 2016).

Here, Lovegrove raised his *Seibert* complaint in his written motion and during the suppression hearing. There were no exhibits or testimony admitted at the suppression hearing as to the officers' subjective intent in questioning Lovegrove while he was handcuffed and before providing any *Miranda* warnings. However, the trial court found that, while Officer Zolli questioned Lovegrove, Officer Gallenkamp read a police report that J.S. reported that an individual named "Alex" had involuntarily transported her to Texas, placed a dog collar on her, and choked her; Officer Gallenkamp then asked Lovegrove if he sometimes went by the name "Alex" and Lovegrove said he did. The officers immediately placed Lovegrove in handcuffs. Moreover, the video shows that a couple of minutes after Lovegrove was handcuffed and while being questioned by Officer Gallenkamp, Officer Zolli pulled out a *Miranda* warnings card, indicating that he expected *Miranda* warnings were needed. Officer Zolli stood by as Lovegrove's questioning proceeded and delayed providing the *Miranda* warnings to him. The State provided no evidence of Officer Zolli's subjective intent in delaying the *Miranda* warnings while holding the card in his hand. *See Carter*, 309 S.W.3d at 39. And the State provided no evidence of Officer Gallenkamp's subjective intent in omitting those warnings before questioning Lovegrove after he was handcuffed. *See id.*; *see also Martinez v. State*, 272 S.W.3d 615, 619 (Tex. Crim. App. 2008) (noting that "failure to give timely [*Miranda*] warnings generally results in the state being required to forfeit the use of any statement obtained during that interrogation during its case-in-chief").

17

On this record, we conclude that the State did not meet its burden of disproving the deliberate employment of a two-step interrogation technique once Lovegrove raised a *Seibert* complaint about the admissibility of his statements to police.  *See Vasquez*, 483 S.W.3d at 554. Accordingly, suppression of Lovegrove's first set of statements on *Seibert* grounds was proper.[15]

**Reinitiation of Interrogation After Invocation of Right to Remain Silent**

The State also contends that Lovegrove initiated conversation with Officer Gallenkamp, after receiving *Miranda* warnings for the third time, by asking if he "could make a statement."   Lovegrove contends that before that point, Officer Gallenkamp unlawfully reinitiated his interrogation, despite Lovegrove's invocation of his right to remain silent and his right to counsel, by asking Lovegrove for comment on the new charges against him.

To safeguard a person's Fifth Amendment right to not be a witness against himself, law-enforcement officials must inform a person in custody before questioning him that he has the right to remain silent and that any statement he makes may be used against him in court.  *Miranda*, 384 U.S. at 444; *Ramos v. State*, 245 S.W.3d 410, 418 (Tex. Crim. App. 2008). Once a person in custody invokes his right to silence, his interrogation must immediately cease, and police officers must scrupulously honor that invocation.  *Ramos*, 245 S.W.3d at 418 (citing *Mosley*, 423 U.S. at 104).  Police officers may resume questioning a person who has previously invoked his right to remain silent if the person himself initiates further discussion about the investigation.  *See Trevino v. State*, 815 S.W.2d 592, 618-19 (Tex. Crim. App. 1991), *rev'd on*

---

[15]   We have determined that the State did not meet its burden of disproving a *Seibert* violation, an inquiry that precedes the determination of whether post-warning statements to police were made voluntarily.  *See Carter v. State*, 309 S.W.3d 31, 41 (Tex. Crim. App. 2010); *Foster v. State*, 579 S.W.3d 606, 612 (Tex. App.—Houston [14th Dist.] 2019, no pet.).  Given that failure of proof, we need not address whether Lovegrove's statements after being handcuffed but before receiving *Miranda* warnings were made voluntarily.

*other grounds*, 503 U.S. 561 (1992). That is, a suspect may affirmatively demonstrate his wish to waive his right to remain silent by reinitiating a dialogue with a law-enforcement officer that is "unprompted by further interrogation." *See United States v. Rieves*, 584 F.2d 740, 745 (5th Cir. 1978).

"[T]he term 'interrogation' under *Miranda* refers not only to express questioning, but also to any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response." *Rhode Island v. Innis*, 446 U.S. 291, 301 (1980). "When police questioning is actually 'designed to elicit an incriminating response from the accused, it is unlikely that the practice will not also be one which the police should have known was reasonably likely to have that effect.'" *State v. Cruz*, 461 S.W.3d 531, 540 (Tex. Crim. App. 2015) (quoting *Innis*, 446 U.S. at 301 n.7).

Here, the video shows that Officer Gallenkamp reinitiated Lovegrove's interrogation after Lovegrove had invoked his right to remain silent and the prior interrogation had ceased. Officer Gallenkamp went back to the patrol car and informed Lovegrove about the change to the charges against him. Lovegrove responded by asking about the meaning of "trafficking." Officer Gallenkamp provided his paraphrased summary of the offense, and Lovegrove replied, "Understood." But the conversation did not cease at that point. Officer Gallenkamp further asked Lovegrove for his comment on the charges. We conclude that asking a suspect who has just been arrested for comment on the charges he faces is "reasonably likely to elicit an incriminating response." *See Innis*, 446 U.S. at 301. We further conclude that Officer Gallenkamp should have known that requesting Lovegrove's commentary on the charges "was reasonably likely to have that effect." *See id.* at 301 & n.7; *Cruz*, 461 S.W.3d at 540.

19

The State focuses on a later portion of the video, characterizing Lovegrove's request to "make a statement" as evidence that he was reinitiating conversation with the police. However, "the critical inquiry is whether the suspect was further interrogated before he reinitiated conversation with law enforcement officials." *See Cross v. State*, 144 S.W.3d 521, 529 (Tex. Crim. App. 2004). The video reflects that Lovegrove's request to make a statement was not "unprompted by further interrogation." *Cf. Rieves*, 584 F.2d at 745. Rather, his request occurred only after Officer Gallenkamp had asked him to comment on the new charges. Because Lovegrove was interrogated before he said that he "was wondering if [he] could make a statement," he did not reinitiate conversation with the police. *See Cross*, 144 S.W.3d at 529.

On this record, we conclude that the State did not show that Lovegrove's reinitiation of conversation with police justified the continuation of his questioning after he invoked his right to remain silent. *See Trevino*, 815 S.W.2d at 618-19. Accordingly, suppression of Lovegrove's second set of statements, which were made without waiver of his prior invocation of his *Miranda* rights was proper

We overrule the State's appellate issues.

## CONCLUSION

We affirm the district court's order.

 

_____

Darlene Byrne, Chief Justice

Before Chief Justice Byrne, Justices Kelly and Smith

Affirmed

Filed:  November 9, 2022

Do Not Publish

20